CLEVELAND v. CITY OF DETROIT.

1. MUNICIPAL CORPORATIONS—PUBLIC USE OF STREETS.
   The streets of a city may be used for any purpose which is a
   necessary public one and the abutting owner will not be
   entitled to a new compensation for additional uses, in the
   absence of a statute giving it, so long as such owners have
   convenient ingress and egress.

2. HIGHWAYS AND STREETS—PARKING—POLICE POWER.
   The use of a highway for the parking of vehicles thereon is a
   lawful use of the highway, and its regulation a matter for
   the exercise of the police power with which, in the absence
   of abuse, the courts should not interfere.

3. MUNICIPAL CORPORATIONS—SUBSURFACE PARKING OF VEHICLES.
   The use of the subsurface of a city street for parking of motor
   vehicles is a proper highway use and the abutting property
   owner is not entitled to compensation for such use in the
   absence of the widening of the street or other damages to
   the owner's property.

4. SAME—PARKING ON A STREET—PRIVILEGE—FEES.
   The parking of vehicles on a city street is not an absolute right,
   but a privilege for which a fee may be charged to meet the
   cost of regulation.

REFERENCES FOR POINTS IN HEADNOTES
[1]  25 Am. Jur., Highways, §§ 154, 163.
[2]  25 Am. Jur., Highways, § 309.
[2]  Right of abutting owner to control cab stands or parking in
     street.   33 A.L.R. 355.
[3]  25 Am. Jur., Highways, § 156.
[3]  Right of abutting owner to permanent use of subsurface of
     street or highway.   7 A.L.R. 646.
[4]  5 Am. Jur., Automobiles, § 58; 25 Am. Jur., Highways, § 184.
[4]  Validity of automobile parking ordinances or regulations.  108
     A.L.R. 1152.
[6]  38 Am. Jur., Municipal Corporations, § 559; 43 Am. Jur., Pub-
     lic Securities, § 77.
[6]  What are "public utilities" within constitutional or statutory
     provisions relating to purchase, construction, or repair of
     same by municipal corporations.   9 A.L.R. 1033, 35 A.L.R. 592.
[8]  42 Am. Jur., Public Funds, § 68.
[9]  42 Am. Jur., Public Funds, § 57.
[10] 14 Am. Jur., Costs, § 91.

5. SAME—SUBSURFACE PARKING FACILITY—REVENUE BOND ACT.

A subsurface automobile parking facility is a public use of a street and a work involving the public safety that may be acquired by a home-rule city under the revenue bond act and the net revenues from fees charged for the privilege may be pledged for the payment of bonds issued under such act (Act No. 94, §§ 3, 4, Pub. Acts 1933, as amended).

6. SAME—AUTOMOBILE PARKING FACILITY—PUBLIC UTILITY.

A municipal subsurface automobile parking facility is not a public utility, hence provisions of the Constitution pertaining to the granting of a franchise do not apply so as to require approval by municipal electors before issuance of bonds under revenue bond act (Const. 1908, art. 8, §§ 22–25; Act No. 94, §§ 3, 4, 10, Pub. Acts 1933, as amended).

7. SAME—REVENUE BOND ACT—CONSTITUTIONAL LAW.

The revenue bond act authorizing municipal corporations to acquire, construct, improve, enlarge, extend or repair public improvements and pay therefor solely from revenues therefrom is constitutional (1 Comp. Laws 1948, § 141.101 *et seq.*).

8. SAME—SUBSURFACE PARKING FACILITY—BUSINESS ENTERPRISE.

A subsurface automobile parking facility to be placed beneath the surface of a public street is not a "business enterprise" within the meaning of a home-rule city's charter requiring approval of three-fifths of electors voting on a business enterprise involving an investment of public funds of more than a certain sum per capita (Detroit Charter [1918], title 3, chap. 1, § 12[h]).

9. SAME—SUBSURFACE PARKING FACILITY—PUBLIC FUNDS—REVENUE BOND ACT.

A subsurface automobile parking facility to be placed beneath the surface of a public street is a public purpose for which public funds may be used, which may be constructed under the revenue bond act and exempted from taxation (Act No. 94, Pub. Acts 1933, as amended).

10. COSTS—PUBLIC QUESTION—SUBSURFACE PARKING FACILITY.

No costs may be taxed in abutting owner's suit for declaration of rights as to city's right to construct a subsurface automobile parking facility beneath the surface of adjacent public street, a public question being involved.

Appeal from Wayne; Miller (Guy A.), J. Submitted January 14, 1949. (Docket No. 45, Calendar No. 44,301.) Decided May 18, 1949.

Bill by Cynthia Mills Cleveland against City of Detroit and another to restrain use of Washington avenue adjacent to plaintiff's property for subsurface parking and to determine plaintiff's property rights in street. Elmer J. Leydet intervened as party plaintiff. Cities of Ann Arbor and Grand Rapids intervened as parties defendant. Decree for plaintiff. Defendant cities appeal. Reversed.

*William Alfred Lucking,* for plaintiff.

*Raymond J. Kelly,* Corporation Counsel, and *John H. Witherspoon* and *Helen W. Miller,* Assistants Corporation Counsel, for defendant City of Detroit.

*Miller, Canfield, Paddock & Stone,* for intervenors.

BUSHNELL, J. Plaintiff Cynthia Mills Cleveland is the owner of—

"The north 50 feet of lot 14, section 10, governor and judges plan of the city of Detroit, as recorded in liber 45, pages 553 and 555 of deeds of Wayne county records; and also the west 5 feet of Washington boulevard, vacated Oct. 8, 1929 (J. C. C. page 2866) lying east of and adjoining in the above described property."

This property is located on the west side of Washington boulevard between Grand River avenue and Clifford street.

By bill in chancery filed November 5, 1947, she sought to enjoin defendant city of Detroit from "erecting, constructing, leasing and operating" an automobile parking garage under the street surface of Washington boulevard adjoining her property. She also sought a declaratory judgment as to her property rights in the west half of the boulevard

adjoining her property, asserting that the proposed construction would violate and impair the protection to which she is entitled under article 1, § 10, of the Constitution of the United States, and the Fourteenth Amendment thereto, and article 2, §§ 9 and 16, and article 8, § 23, of the Michigan Constitution (1908).

Plaintiff Elmer J. Leydet, who describes himself as a resident and taxpayer of the city of Detroit, subsequently filed a bill of complaint in which he adopted the allegations of the Cleveland bill, and asserted right to relief for himself and all other taxpayers of the city similarly situated. He raised questions of the exemption of the proposed underground garage from ad valorem taxation, the expenditure of tax money by the city to relocate municipally- and privately-owned utilities, as well as general constitutional questions.

The cities of Ann Arbor and Grand Rapids were permitted to intervene as parties defendant because of their interest in the question of parking meters and off-street parking facilities. Washington Boulevard Underground Parking, Incorporated, participated in the trial of the cause and afterwards the bills of complaint were dismissed as to it for the reason that no testimony had been adduced to show that this nonprofit corporation "proposes to build, finance or operate" the garage in question.

The appeal here is from a decree entitled "Final Judgment," entered on October 29, 1948, in which it was determined that plaintiff Cleveland has title in fee simple to the center of Washington boulevard, abutting and adjoining her property "subject to the easement of the public for its use as a public highway;" that the erection and operation of the proposed garage is unlawful, invalid and an unconstitutional invasion of plaintiff's rights in that such rights have not been acquired by condemnation or

otherwise; and that such erection and operation would impose an additional servitude upon plaintiff's title, as well as constitute the putting of the city of Detroit into "an unconstitutional private business of a nongovernmental character," in competition with plaintiff's present use of her property as an automobile parking lot, and that the exemption of the proposed garage from taxation is also unconstitutional and unlawful. The court further determined that the resolution of the common council of the city of Detroit, which authorized the project, was improper in that the law under which it purported to act (the revenue bond act, being Act No. 94, Pub. Acts 1933, as last amended by Act No. 204, Pub. Acts 1947 [1 Comp. Laws 1948, § 141.101 *et seq.* (Stat. Ann. 1949 Rev. § 5.2731 *et seq.*)]), is invalid and unconstitutional; that the payment by the city of the cost of relocating the utilities is an unlawful use and misappropriation of tax moneys; and that the approval on November 5, 1945, by the electors of Detroit on the question hereinafter quoted was not of such nature as to authorize the project in question.

The court did, however, hold, although somewhat inconsistently, that parking meters "are a public transportation utility," which must be paid for and maintained solely from their revenue, which revenue may be combined with that "from the proposed underground parking facility," but that the project "must be self-sustaining."

The city was permanently enjoined and restrained from proceeding in the premises.

The following explanatory statement of the factual background is quoted from the trial judge's opinion:

"The garage, as designed, would extend from six inches east of the west curb, across Washington

boulevard, to six inches west of the east curb. It would be 156 feet wide, 1,000 feet long, and 2 stories deep. The excavation required for the building, although it will not all be made at once, will cover that area, and will necessitate going upwards of 35 feet down into the ground. All sewers, water pipes, and public utility conduits which are now under the paved portion of Washington boulevard will have to be relocated. The over-all cost of the building is estimated at $3,950,000. The entire pavement of Washington boulevard would be replaced by a fenced-in hole around 15 feet deep. The work of construction would probably extend over one, possibly two, years. The relocation work alone would take at least six months, on the city's estimate.

"It is proposed that this cost be defrayed by the issuance of two and one-half millions of dollars in revenue bonds, which are to be paid, principal and interest, out of the net earnings of the garage, when it is earning something. $500,000 has been pledged by property owners, who are all interested in downtown retail establishments.

"The cost of relocating the public utilities is estimated to be $750,000. The people who made the estimate have not been sworn; nor is any testimony in the case to show that the work can be done for $750,000. It is perfectly within the bounds of possibility that it will cost twice that much to relocate these underground existing works.

"Under the sidewalks most of the buildings now in existence on Washington boulevard have subsurface basements which extend to, or in the neighborhood of the existing curb-lines. Some of these subsurface basements go as far into the earth as four stories below the street surface. There is no evidence that any of these abutting underground property owners pay any revenue to the city whatever for their use of this underground portion of the public highway."

A nonprofit corporation, known as the Washington Boulevard Underground Parking, Inc., was formed in 1945 by interested property owners, merchants, and other businessmen to explore the feasibility of constructing and financing parking facilities. It subsequently recommended that the city construct this facility at a then estimated cost of a little less than $2,000,000, to be financed through the sale of revenue bonds. After considering the matter, the council submitted the following question to the electors:

"Do YOU FAVOR permitting the city of Detroit to construct and operate a garage for the parking and storage of vehicles beneath the street surface of Washington boulevard, between Grand Circus Park on the north and Grand River avenue on the south, said garage to be financed by the issuance of revenue bonds which will not be a general obligation of the city but are to be secured entirely by the revenue derived from the project?"

The people responded affirmatively with a vote of 319,889, and negatively, 68,904. A firm of architects prepared plans and specifications and in 1947 a municipal parking authority was created by ordinance, charged with the duty of determining the parking needs of the city and recommending facilities to meet those needs. At the same time the council adopted a resolution setting up a fiscal plan to meet the then estimated cost of $3,000,000, exclusive of an estimated cost of $750,000 for relocating municipally- and privately-owned utilities. The plan in question was outlined as follows: $500,000 voluntary payments by property owners in the area, the issuance of $2,500,000 of revenue bonds, and the exemption of the project from ad valorem taxation. The council agreed to accept such contributions and pay the cost of relocating those utilities. This resolu-

tion and a companion thereto, containing a request that telephone, gas and electric utilities be relocated at the expense of the companies concerned, were laid on the table.

The testimony presented before the trial judge shows that the city of Detroit has a major parking problem in its central business district, due to a shortage of both on-street and off-street parking facilities, and that the resultant congestion creates problems involving public safety.

The record also shows that the subsurface of the sidewalk area, and in some cases parts of highway area elsewhere in downtown Detroit, are being used exclusively in connection with downtown businesses, office buildings, and other properties without any revenue therefrom accruing to the city. In some instances municipal permission has been granted, as in the case of the J. L. Hudson Company, which uses 4 subbasements under the sidewalks and streets surrounding its department store, which occupies an entire city block, bounded by Woodward and Grand River avenues and Farmer and State streets.

The parties stipulated that certain matters "may be considered as offered in evidence without further proof." Among these were the proceedings of the common council relative to the establishment of a building line on the west side of Washington boulevard as shown in the journal of the common council for 1912 at page 2040, and 1929 at pages 2866 and 3052.

Plaintiff's title came to her by reason of the death of her father, Merrill B. Mills. In an undated petition addressed to the common council, in which its resolution of 1912 is mentioned, the Union Trust Company, as executor of the will of Merrill B. Mills, deceased, joined with other Washington boulevard property owners in stating that they have executed and tendered for filing with the city clerk waivers in

accordance with the proviso of the 1912 resolution. That proviso was that the city would vacate the west 5 feet of a part of Washington boulevard if abutting property owners would file—"a waiver of any and all right, title or claim which they may have in and to any other portion of said avenue by reason of occupation, user or otherwise, so long as such other portion is used for street purposes, and said waiver is approved by the corporation counsel and accepted and approved by the common council."

The purpose of this whole transaction was to correct the building line on the west side of Washington boulevard. The record shows that the petition was granted, the waiver approved and accepted, and plaintiff in her bill of complaint asserts ownership to the 5 feet lying east of and adjoining her premises.

The trial judge, in addition to holding that "abutting owners do own to the center of the street," et cetera, discussed at length the widespread use by others of the subsurface under sidewalks, and even streets, and concluded that the proposed subsurface use here by the city would impose an additional servitude upon the fee for which the owner of the abutting property is entitled to proper compensation. This conclusion, in his judgment, was sufficient to determine the issue, although he discussed and decided other questions.

It is unnecessary in the instant case to determine whether plaintiff's title extends to the center of the highway, but assuming, for the sake of argument, that it does, we said in *Detroit City Railway* v. *Mills,* 85 Mich. 634, 653:

"Whatever may have been the ancient adjudications limiting the rights of the public in the streets to passage and repassage, and whatever may now be the rule with regard to highways in the country, with the growth of population in our cities have come

increased needs for heating, lighting, draining, sewerage, water, et cetera, and with these has come also a corresponding extension of the public rights in the streets. Immense sewers and water mains may be dug, and the soil removed, culverts and drains constructed, without compensating the abutting owners. It may now be considered the well-settled rule that the streets of a city may be used for any purpose which is a necessary public one, and the abutting owner will not be entitled to a new compensation, in the absence of a statute giving it.  *  *  *

"So far, then, as these defendants are concerned, it is immaterial whether they or the city own the fee in the street. Their rights are the same in either case. So long as they are unobstructed in the use and enjoyment of their property, having convenient ingress and egress, and the use of the street is an authorized and proper public use, they have no legal cause for complaint."

This Court also said in *Re Widening of Fulton Street,* 248 Mich. 13 (64 A.L.R. 1507):

"It does not seem to us that the dearth of adjudicated cases directly in point renders the rule of law obscure or doubtful. From the day of the oxcart there have been maintained in the public highways hitching posts and rails by which provision was made for the leaving of animal-drawn vehicles at proper places on public thoroughfares. The demand of our motor age has greatly increased the necessity for space in the public streets for leaving vehicles. This right is of importance to the tradesmen along the street as well as to the traveler thereon. One would hardly have the temerity to question that such a use is a lawful use of the highway. Its regulation is a matter for the exercise of police power, with which, in the absence of abuse, courts should not interfere. In the future, this space which the city seeks to add to Fulton street may or may not be used for parking. The land was taken 'for street purposes.' But parking is a proper use of the highway, and if ne-

cessity therefor exists, the right of eminent domain may be exercised to establish or widen highways adequate for this purpose. The taking of the land for highways is not limited to that necessary for actual travel. *In re Petition of City of Detroit for a Park Site,* 227 Mich. 132."

The instant project differs only from the situation presented in the *Fulton Street Case,* in that the use proposed is subsurface in character. However, that type of use was approved in the *Mills Case* so far as "heating, lighting, draining, sewerage, water, et cetera," are concerned.

We thus conclude that the use of the subsurface of Washington boulevard for parking, in the light of the *Mills* and *Fulton Street Cases,* is a proper highway use and the abutting property owner is not entitled to any compensation for such use in the absence of the widening of Washington boulevard or other damages to plaintiff's property. So viewing the matter, we are obliged to discuss other questions raised.

The first of these has to do with the determination in the decree that the construction and operation of the "proposed under-surface parking garage will and does contemplate and constitute the putting of defendant city of Detroit into an unconstitutional private business of a nongovernmental character," for which tax moneys may not be expended or revenue bonds issued. This proposition was answered to the contrary in *Bowers* v. *City of Muskegon,* 305 Mich. 676, and the recently decided case of *Wayne Village President* v. *Wayne Village Clerk,* 323 Mich. 592. In the *Wayne Case* we quoted the following from the *Bowers Case:*

"We have in mind that we are now living in a modern age; that the traffic problems are a result of our present mode of living; that cities have spent untold dollars in the construction of elevated roads,

subways and parkways to take automobile traffic out of congested areas; and that any city with a population equal to that of Muskegon has its own peculiar traffic problem. We also have in mind that Const. 1908, art. 8, § 28, provides:

" 'The right of all cities, villages and townships to the reasonable control of their streets, alleys and public places is hereby reserved to such cities, villages and townships.' * * *

"It must be assumed that parking in a city street is a privilege and subject to regulation by the proper authorities of the city entailing upon the city additional expenses in order that there may be proper supervision and regulation. If parking is a privilege and not an absolute right, the power to regulate implies the power to exact a fee for the cost of such regulation."

And we added:

"We conclude that a municipal parking system combining parking facilities both on public streets and on off-street property of a municipality, for which a charge for use is made, is a public use, and a public improvement within the meaning of the revenue bond act; that the acquisition and operation of such system by a municipality is not forbidden by the Michigan Constitution; that a municipality has the power to pledge the net revenues therefrom for the acquisition of off-street property and the operation and maintenance thereof as a part of such system; that the municipality has the power to issue revenue bonds payable solely out of the net revenues derived from the operation of such system, and to pledge such net revenues for payment of such bonds; and that the municipality has the power to pledge itself to acquire and maintain parking meters on such street and off-street property, and charge rates for the use of such facilities to provide for the payment of such bonds."

Prior to this statement we said "an automobile parking system is not a public utility and article 8,

§§ 23, 24 and 25 of the Constitution (1908) do not apply."

That portion of the decree below which holds that the revenue bond act, *supra,* is invalid and unconstitutional is contrary to our holdings in *Young* v. *City of Ann Arbor,* 267 Mich. 241; *Block* v. *City of Charlevoix,* 267 Mich. 255; *Gilbert* v. *City of Traverse City,* 267 Mich. 257; and *Wayne Village President* v. *Wayne Village Clerk, supra.* A public purpose being involved, public funds may be used therefor. *Morley Brothers* v. *Township of Carrollton,* 305 Mich. 285.

Furthermore, we cannot agree with the trial judge and the decree entered in the light of his opinion that the election and financing of the project—"has neither been submitted to nor authorized or approved by the necessary vote of the electors of defendant city of Detroit, in accordance with the mandatory requirements of the city's charter and of article 8, section 25, of the Constitution of Michigan."

The project in question is not a "business enterprise" (charter of the city of Detroit, title 3, chap. 1, § 12[h]); nor is the cited section of the Constitution applicable thereto (*Wayne Village President* v. *Wayne Village Clerk, supra*).

The submission of the question was not required by law and the vote thereon was merely advisory.

We do not agree with that portion of the decree in which it is stated in substance that such underground parking facility, though like other public works to be constructed under the provisions of the revenue bond act (Act No. 94, Pub. Acts 1933, as amended) may not properly be exempted from taxation. This determination is contrary to that in *Ford Motor Co.* v. *City of Detroit,* 267 Mich. 177.

The decree entered below is vacated and one may be entered in conformity with this opinion. A public question being involved, no costs will be taxed.

SHARPE, C. J., and BOYLES, REID, NORTH, DETHMERS, BUTZEL, and CARR, JJ., concurred.