GEORGE F. BARNES *v.* CITY OF NEW HAVEN ET AL.

BROWN, C. J., BALDWIN, INGLIS, O'SULLIVAN and QUINLAN, Js.

Argued April 8—decided June 2, 1953

*John N. Reynolds,* with whom, on the brief, was *William L. Beers,* for the plaintiff.

*John W. Barclay,* with whom, on the brief, was *George G. DiCenzo,* for the defendants.

BROWN, C. J. This is a taxpayer's action seeking a declaratory judgment and injunctive relief. Under their answer the defendants claim a further declaratory judgment. The case comes to us from the Superior Court on a reservation which raises questions as to the validity and interpretation of 1951 Special Act No. 473 (26 Spec. Laws 339), entitled "An Act concerning the Creation of a New Haven Parking Authority" and approved July 10, 1951. The act took effect September 10, 1951, upon approval by a majority of the electors participating in a referendum pursuant to § 11 thereof. It provides (§ 2) for the appointment of a parking authority of five members with power (§ 3), subject to the approval of the board of aldermen, to acquire, create and establish, as well as operate, parking facilities and to collect reasonable off-street parking fees for their use. It specifies (§ 1) that these facilities may include "lots, garages, parking terminals or other structures and accommodations for the parking of motor vehicles off the street or highway and open to public use with or without charge," and authorizes (§ 3) the exercise of the power of eminent domain to acquire them. It further provides (§ 3) that when parking facilities have been procured they either may be operated by the parking authority itself or may be leased by it to private parties for operation restricted solely to parking, "upon such terms and conditions as the public interest may warrant." An express procedural restriction upon the authority's power states (§ 2) that "[n]o action of said authority shall be valid unless authorized by a vote of the majority of its members taken at a meeting open to the public." The act gives the city broad latitude in financing the undertaking. It thus provides (§§ 4, 5), subject to specific authorization by the board of aldermen, for

the issuance of bonds constituting a general obligation of the city or of bonds payable only out of parking revenues, for the appropriation of funds raised by taxation, and for the assessment of benefits against owners of property specifically benefited by any parking facility. It contains further provisions (§§ 6, 7, 9) to safeguard the holders of revenue bonds and to exempt these bonds from taxation within the state.

The reservation is not in proper form. The stipulation fails to "clearly and fully state the . . . questions upon which advice is desired." Practice Book § 470. Nor does it comply with Form No. 570 of the Practice Book. "Questions in a reservation should be so stated that each will present a definite point of law and that the court may give to each a categorical or very definite answer." *Ericson* v. *Childs,* 124 Conn. 66, 82, 198 A. 176; *General Motors Corporation* v. *Mulquin,* 134 Conn. 118, 132, 55 A.2d 732. The parties have merely stipulated that the questions are those "upon which the claims for a declaratory judgment are made in the complaint and the answer." Nevertheless, in view of the importance of the public interest involved in the issues concerned, we have decided to entertain the reservation. *General Motors Corporation* v. *Mulquin,* supra, 133. By various concessions made in the plaintiff's brief, his questions are limited to those stated in the first three questions in the footnote.[1] The last five cover the questions propounded by the defendants.

---

[1] (1) Is Special Act No. 473 of the 1951 session of the General Assembly unconstitutional because the parking project provided for therein is not a legitimate public purpose?

(2) Does the fact that the act contains no legislative findings of any public purpose to be served by it, or any need upon which it could be based, render it unconstitutional?

(3) Is the parking authority restricted under the act to furnishing

The further essential stipulated facts may be thus
summarized: New Haven was settled in 1638, and
the layout of its streets and its traffic facilities have
developed gradually over the intervening three and
a quarter centuries. The present streets, highways
and parking facilities, both public and private, are
inadequate for the safe, convenient and expeditious
handling of modern motor traffic. In the process of
normal development, retail shopping and other com-
mercial business have tended to become largely con-
centrated in the downtown business areas, necessitat-
ing a large amount of traffic between those areas and
the residential sections. For the convenience of the
public in transacting business with stores and other
business establishments, modern motor traffic re-
quires parking facilities beyond the capacity of the
public streets and present private parking facilities.
The establishment of additional parking facilities
will relieve traffic congestions and reduce traffic
hazards.

The five individual defendants constitute the park-
ing authority under § 2 of the act. The authority has
already paid out substantial sums of public funds in
obtaining plans, reports and the services of a traffic
engineer and for other expenses, and threatens to

---

parking facilities during normal business hours and in the daytime
only?

(4) May the parking authority hold any meetings from which the
public is excluded?

(5) If so, what business may be transacted at meetings from which
the public is excluded?

(6) May the parking authority preclude members of the public from
being heard or participating in its deliberations at its public meetings?

(7) If not, to what extent are members of the public entitled to
address public meetings of the parking authority and to participate
in its deliberations?

(8) What notice, if any, must the parking authority give to the
public of its public meetings?

continue to incur similar obligations at public expense. It has adopted plans for the construction and maintenance of parking facilities which, after receipt of the city plan commission's report thereon, the board of aldermen has approved. To carry out its plans for such facilities, the authority threatens to acquire land by purchase and by eminent domain and to use land already owned by the city, including certain land heretofore dedicated to school and other public uses. To finance the establishment and operation of the facilities, the authority threatens to use one or more of the methods provided in the act. It further intends to operate the facilities as a business, either directly, exacting fees and other special charges therefor, or indirectly, under lease or contract for their operation by others. The provisions of the act and the plans adopted by the authority thereunder are primarily for the benefit of merchants in the shopping center of the city, who constitute but a small portion of its total population and whose need for parking facilities is limited to the usual daytime store hours. The authority, however, threatens to operate the facilities on a twenty-four hour basis. The meetings of the authority are held after public notice and at a place where adequate provision is made for the attendance of the public. At these meetings the public is invited to address the authority upon particular questions being discussed, in so far as the authority, in its discretion, deems desirable.

The fundamental question for decision is whether the parking project for which the act provides is a legitimate public purpose. While the specific question has not been passed upon by this court, the principles applicable in its determination are well established under our decisions. These relate primarily

to the effect of the provision of § 1 of article first of the Connecticut constitution, which states that "no man, or set of men are entitled to exclusive public emoluments or privileges from the community." This provision has a like meaning to that which prohibits the states from denying to any person the equal protection of the laws, contained in the fourteenth amendment to the constitution of the United States. *Lyman* v. *Adorno,* 133 Conn. 511, 515, 52 A.2d 702; *State ex rel. Higgins* v. *Civil Service Commission,* 139 Conn. 102, 105, 90 A.2d 862. As we further observed in the former opinion, "[t]he broad provision in § 1 of article third of our constitution which vests the legislative power in the General Assembly is subject to the limitation that an act which serves no other purpose than individual gain or profit goes beyond the power of that body to enact and is necessarily void. . . . That is not to say that, if an act serves a proper public purpose, the fact that it incidentally confers a direct benefit upon some individual or individuals renders it invalid." The aggravated nature of the traffic problem on city streets and the serious effect which it has upon a very large part of the public in such localities are a matter of common knowledge of which courts take judicial notice. *State ex rel. Gordon* v. *Rhodes,* 156 Ohio St. 81, 95, 100 N.E.2d 225. The stipulated facts leave no doubt that such a situation exists in New Haven and constitutes a problem increasingly urgent. It is one which calls for an appropriate exercise of the police power of the state operating through the city as one of its municipalities. A limit upon the exercise of this power, however, is fixed by the constitutional provision quoted above. Whether the act does provide for a legitimate public purpose in the constitutional sense involves the question whether it primarily

serves, in a reasonable manner, to promote the public welfare. *Lyman* v. *Adorno,* 133 Conn. 511, 517, 52 A.2d 702; *State* v. *Cullum,* 110 Conn. 291, 293, 147 A. 804. If it does, that an incidental financial benefit may result to certain individuals as distinguished from the public at large does not deprive it of its legitimate public purpose.

A public use defies absolute definition, for it changes with varying conditions of society, new appliances in the sciences, changing conceptions of the scope and functions of government, and other differing circumstances brought about by an increase in population and new modes of communication and transportation. *McSorley* v. *Fitzgerald,* 359 Pa. 264, 270, 59 A.2d 142; 37 Am. Jur. 734, § 120. Courts as a rule, instead of attempting judicially to define a public as distinguished from a private purpose, have left each case to be determined on its own peculiar circumstances. Promotion of the public safety and general welfare constitutes a recognized public purpose. "If the expenditure of public funds will promote the welfare of the community, it is for a public purpose." *Lyman* v. *Adorno,* supra. The modern trend of authority is to expand and liberally construe the meaning of "public purpose." The test of public use is not how the use is furnished but rather the right of the public to receive and enjoy its benefit. As we pointed out in the *Lyman* case, supra, 518, what constitutes a public purpose is primarily a question for the legislature, and its determination should not be reversed by the court unless it is manifestly and palpably incorrect. 37 Am. Jur. 734, § 120. While, as stated above, each case which turns upon whether or not the legislation in question relates to a public use is to be determined upon its own peculiar facts, an unusual wealth of recent decisions, predicated on

sufficiently analogous facts, affords a very explicit guide and satisfying authority for our answer to that question in this case.

The very substantial weight of authority supports the conclusion that the use in question is a public use. *De Lorenzo* v. *Hackensack*, 9 N.J. 379, 384, 88 A.2d 511. The following decisions are fairly representative of others which might be cited: *Whittier* v. *Dixon*, 24 Cal. 2d 664, 667, 151 P.2d 5; *San Francisco* v. *Linares*, 16 Cal. 2d 441, 447, 106 P.2d 369; *Poole* v. *Kankakee*, 406 Ill. 521, 526, 94 N.E.2d 416; *Miller* v. *Georgetown*, 301 Ky. 241, 246, 191 S.W.2d 403; *Wayne Village President* v. *Wayne Village Clerk*, 323 Mich. 592, 597, 36 N.W.2d 157; *Cleveland* v. *Detroit*, 324 Mich. 527, 538, 37 N.W.2d 625; *Denihan Enterprises, Inc.* v. *O'Dwyer*, 302 N.Y. 451, 457, 99 N.E.2d 235; *McSorley* v. *Fitzgerald*, 359 Pa. 264, 269, 59 A.2d 142; see, note, 8 A.L.R.2d 373, 376.

In the *McSorley* case, supra, the court, in sustaining the constitutionality of such a law, said: "[I]ts real purpose is to promote the larger and more general good of the community by freeing the streets of the impediments and perils arising from dangerous and often intolerable conditions of traffic congestion. And since the Act is concerned with the regulation of the transportation of persons and property along the highways of the municipality, and since the evils it seeks to remedy vitally affect conditions for the transaction of business, the prevention of accidents, the effective operations of fire and police forces, and, in general, the enjoyment of many phases of city life and activities, its justification stems directly from the exercise of the police power, which is the supreme power of government." In *Whittier* v. *Dixon*, 24 Cal. 2d 664, 667, 151 P.2d 5, the court said: "Just as public streets can be used for the parking of motor

vehicles, property can be acquired for the same use. Moreover, public parking places relieve congestion and reduce traffic hazards and therefore serve a public purpose." In *Wayne Village President* v. *Wayne Village Clerk,* 323 Mich. 592, 605, 36 N.W.2d 157, the court said: "[W]e conclude that a municipal parking system combining parking facilities both on public streets and on off-street property of a municipality, for which a charge for use is made, is a public use, and a public improvement within the meaning of the revenue bond act." In *Poole* v. *Kankakee,* 406 Ill. 521, 528, 94 N.E.2d 416, the court, after referring to other evils of traffic congestion as justifying an ordinance for the purchase of land by the city to provide off-street parking, continued: "Further, the economic effect of traffic strangulation has been reflected in slumping values of business real estate and a proportionate decline in local tax income. As we view it, there is involved the safety and well-being of all the residents of a community so affected. To provide for off-street parking facilities is certainly a step to meet the public need." These quotations suffice to indicate the reasoning of the courts in concluding in the above cases that the use involved was a public use. On the basis of logic and common sense, fortified by these authorities, we conclude that the parking project provided for by Special Act No. 473 is a legitimate public purpose.

While the act contains no express legislative finding of any public need or public purpose as reason for its adoption, this does not mean that for lack of such finding it must be held that no such purpose is involved. The provision in the first section of the act stating that all parking facilities of the authority are to be "open to public use," and the stipulated facts establishing that parking facilities "beyond the

capacity of the public streets and present private parking facilities" are essential, suffice to show that a public need and purpose was involved which called for the enactment of the law. That the authority's operation of its parking facilities may involve some incidental loss to private competitors constitutes no reason for holding that the act does not meet a legitimate public purpose. It is no constitutional objection to a statute which provides for the development of parking facilities, "nor does it derogate from the public character of its objective, that the Authority will to some extent conduct what may heretofore have been regarded as a private enterprise; to hold otherwise would mean that the State would be powerless, within constitutional limitations, to act in order to preserve the health and safety of its people even though such action were imperative and vital for the purpose." *McSorley* v. *Fitzgerald,* 359 Pa. 264, 270, 59 A.2d 142; see *Poole* v. *Kankakee,* 406 Ill. 521, 529, 94 N.E.2d 416. Whether such competition as may prove incidental to the authority's operations occurs in the daytime or the nighttime is immaterial. Nor does the possibility that the act may prove of greater benefit to store owners in the shopping district than to some other residents of the city render it invalid as discriminatory, any more than would the outlay of public funds to pave a particular section of street, with its greater benefit to the immediate abutters than to others. *Brodhead* v. *Denver,* 126 Colo. 119, 125, 247 P.2d 140.

That the parking project provided for by the act is a legitimate public purpose affords full answer to certain other incidental claims advanced by the plaintiff. The exemption from taxation within the state of bonds issued pursuant to the act is in its effect the equivalent of an expenditure of public funds. There-

fore, the amount so lost in taxes no more affects the validity of the act than would the expenditure of a like amount of public funds thereunder. Since the development and operation of parking facilities is a proper municipal function devoted to a public purpose, public property of all kinds, as well as public funds in the manner provided in the act, may be used for the purpose. *Cleveland* v. *Detroit,* 324 Mich. 527, 539, 37 N.W.2d 625. For a similar reason, exercise of the power of eminent domain under the act, to acquire property for the purposes of the authority, can involve no violation of § 11 of article first of the constitution of Connecticut. "[P]rivate property may be condemned for parking motor vehicles when the public is primarily served in the taking of such vehicles from our streets to relieve traffic congestion." *Denihan Enterprises, Inc.* v. *O'Dwyer,* 302 N.Y. 451, 458, 99 N.E.2d 235; *McSorley* v. *Fitzgerald,* 359 Pa. 264, 271, 59 A.2d 142; *Richmond* v. *Dervishian,* 190 Va. 398, 406, 57 S.E.2d 120. Again, the leasing of a parking facility by the authority to another to operate would not be inconsistent with the public character of the facility, since the fact that such private lessee may gain thereby is merely incidental to the public purpose of operating it for the use of the public. *Poole* v. *Kankakee,* 406 Ill. 521, 529, 94 N.E.2d 416. Finally, the act is not unconstitutional as a delegation by the General Assembly of the state's legislative power in violation of § 1 of article third of the constitution of Connecticut. *State* v. *Cederaski,* 80 Conn. 478, 480, 69 A. 19. Creation of independent authorities to effectuate a public purpose within the area of the municipality is a proper exercise of the legislative function. *De Lorenzo* v. *Hackensack,* 9 N.J. 379, 385, 88 A.2d 511.

It remains only to determine the meaning of the

procedural restriction in § 2 of the act. As already stated, this provides that no action of the authority "shall be valid unless authorized by a vote of the majority of its members taken at a meeting open to the public." While this language does not mean that the authority cannot meet in executive session from which the public is excluded to consider and discuss any matters incident to the performance of its duties, it does require that, whenever effective action by the authority involves a formal vote, such vote must be taken "at a meeting open to the public." The words quoted call for a meeting held after reasonable notice given through the press or other local news medium, in a public place where members of the public may attend and observe the action taken by those functioning as members of the authority. It does not entitle any member of the public to participate at such meetings or to be heard unless the authority sees fit to invite participation by the public or to conduct a public hearing on a given matter under consideration. No vote taken shall be valid unless a majority of the members of the authority cast their votes in favor of it.

To the first, second and third questions in the reservation, we answer "No"; to the fourth and sixth questions, we answer "Yes"; in answer to the fifth question, we advise that only such business as involves no formal vote may be transacted at meetings from which the public is excluded; in answer to the eighth question, we advise that the parking authority must give reasonable notice to the public of the time and place of the holding of its public meetings, through the press or other local news medium; the seventh and remaining question requires no answer.

No costs will be taxed in this court to any party.

In this opinion the other judges concurred.