JOHN T. ROAN *v.* CONNECTICUT INDUSTRIAL BUILDING COMMISSION ET AL.

MURPHY, SHEA, ALCORN, COMLEY and THIM, JS.

Argued December 6, 1962—decided February 26, 1963

*Milton Sorokin,* with whom was *Ethel S. Sorokin,* for the plaintiff.

*Palmer S. McGee, Jr.,* for the named defendant.

*Albert L. Coles,* attorney general, for the defendant state bond commission.

*John W. Barnett,* for the defendant Superior Industries Corporation of Connecticut.

*Bruce W. Manternach,* for the defendant Connecticut General Life Insurance Company.

MURPHY, J.   The plaintiff seeks a declaratory judgment as to the constitutionality of Public Act No. 542, adopted by the 1961 General Assembly, now chapter 579 of the General Statutes, comprising §§ 32-10 to 32-22.   The act created the Connecticut industrial building commission; authorized it to insure the mortgage payments on first mortgages of industrial projects if, in each case, the mortgage does not exceed 90 percent of the cost of the project, nor $5,000,000; and pledged the faith and credit of the state to the performance of the insurance undertaking.   The total amount of insured mortgages is not to exceed $25,000,000 at any one time or such an amount as is approved by the state bond commission, whichever is lesser.   The building commission has under consideration the application of the defendant Connecticut General Life Insurance Company for the insurance of a $990,000 mortgage loan to the defendant Superior Industries Corporation of Connecticut.   Upon a stipulation of facts by the parties, the Superior Court has reserved the matter for the advice of this court.[1]

The act defines an "industrial project" as "any new building or real estate improvement, including

---

[1] "2. The questions upon which advice is desired are as follows:

"(1) Is Chapter 579 of the General Statutes of Connecticut, revised to 1962, unconstitutional in that it entitles the defendant, Superior Industries Corp. of Connecticut and the Connecticut General Life Insurance Company and others to exclusive public emoluments or privileges in violation of Section 1 of Article First of the Constitution of the State of Connecticut?

"(2) Is the authority conferred upon the Connecticut Industrial Building Commission by Chapter 579 of the General Statutes of Connecticut, revised to 1962, without adequate legislative standards so as to be an unlawful delegation of legislative powers in viola-

remodeling and refurbishing of existing property, in Connecticut and, if a part thereof, the land upon which it is located, all real property deemed necessary to its use, and the extension or provision of utilities, access roads and other appurtenant facilities, which is to be used or occupied by any industry for the manufacturing, processing or assembling of raw materials or manufactured products, or for industrially-connected research facilities, or warehousing, or which the commission determines will tend to provide gainful employment for the people of the state, increase the tax base of the economy and diversify and expand industry." § 32-10. The governor is authorized to appoint five members to the building commission, at least two of whom shall be experienced in the field of industrial mortgage lending. § 32-11. The commission is to appoint and employ an executive secretary, who is to be its chief administrative officer; § 32-12; and who is to receive all applications submitted to it for insurance. § 32-15. Each application is to be forwarded to the Connecticut Development Credit Corporation, hereinafter called the credit corporation, for an investigation ánd report as to the ad-

---

tion of Section 1 of Article Third of the Constitution of the State of Connecticut?

"(3) Is the requirement that every loan application be referred to a private corporation, The Connecticut Development Credit Corporation, for investigation and recommendation an improper delegation of legislative authority in violation of Section 1 of Article Third of the Constitution of Connecticut or in violation of Section 1, Article First of the Constitution of Connecticut?

"(4) Is Chapter 579 of the General Statutes of Connecticut, revised to 1962, unconstitutional in that it denies the plaintiff equal protection of the law and due process of law in violation of Sections 1 and 12 of Article First of the Constitution of the State of Connecticut and Amendments 5 and 14 of the Constitution of the United States of America?"

visability of approving the proposed loan for insurance by the commission. Payment to the credit corporation for its services is on a cost basis. Factors which the credit corporation must consider and report on are included in the act. A copy of each application for insurance is to be forwarded to the Connecticut development commission, which is also to receive a copy of the report of the credit corporation. The development commission may submit its recommendations to the building commission. Upon receipt of the report from the credit corporation and after such other action as the building commission deems appropriate, the building commission is to act on the application, but it is prohibited from approving any mortgage unless it finds the project to be financially sound. § 32-15.

The act permits the building commission to insure mortgage payments on approved projects upon such terms as it prescribes and as are provided in the act; adopt rules for the conduct of its business; request advice on projects from municipal officials or planning bodies in the locality involved; and acquire properties to safeguard the commission from losses. § 32-13. Provision is made for the procedure to be followed upon default by the mortgagor. § 32-17. Subject to certain prescribed limitations, mortgages are declared to be legal investments for insurance companies, banks, other financial institutions, fiduciaries and pension, profit sharing and retirement funds. § 32-19. The act created an industrial building mortgage insurance fund which is to be used as a nonlapsing, revolving fund to carry out the purposes of the act, and it authorized the state bond commission to issue bonds of the state in principal amounts not to exceed, in the aggregate, $25,000,000 to finance the

fund. §§ 32-14, 32-22. The commission is required to fix the mortgage insurance premiums, to be paid by the mortgagors or mortgagees for the insurance of mortgage payments, at a rate not to exceed 2 percent per year on the outstanding principal obligation. § 32-18. The amount of the premium need not be uniform among the various loans insured. § 32-18.

The plaintiff challenges the constitutionality of this legislation on three grounds: (1) It authorizes the use of public funds and the pledging of the faith and credit of the state for a private benefit which is not incidental to any public purpose. (2) It authorizes the delegation of legislative power to the building commission without adequate standards to guide the commission. (3) It authorizes the delegation of legislative power to a private corporation, the Connecticut Development Credit Corporation, and grants it an exclusive public emolument.

At the outset, it must be borne in mind that, in testing the constitutionality of an act of the legislature, we are not to assess it in the light of what we think of the wisdom and discernment of the law-making body in the particular instance. Rather we are bound to approach the question from the standpoint of upholding the legislation as a valid enactment unless there is no reasonable ground upon which it can be sustained. *Cyphers* v. *Allyn,* 142 Conn. 699, 705, 118 A.2d 318; *Lyman* v. *Adorno,* 133 Conn. 511, 514, 52 A.2d 702. The burden of proving unconstitutionality rests on the plaintiff. His main argument that the act authorizes the use of public funds for private benefit and is devoid of a public purpose revolves around the claim that the benefit is to accrue to the mortgagee who is authorized to loan money on the project, with the

state assuming the loss if the mortgagor defaults or is unable to meet his commitments. That the lenders derive a protection that ordinarily would not exist cannot be denied. But that is merely incidental to the principal reason for this legislation. The legislature was aware that Connecticut, the most industrialized state in the nation, faced competition in retaining its present industries and attracting new industries. Other states had enacted legislation to facilitate the financing of construction for new industry and the renovation and modernization of existing facilities. While the population of Connecticut was increasing, the number of industrial employees was decreasing. Substantial unemployment existed in many industrial areas, and factories which for many years had, in each instance, been the sole industry in a certain area had closed down. Existing plants, to a large extent, are so obsolete and inefficient that considerable manufacturing space is required merely to replace them, and it is also necessary to construct new buildings to provide for the expansion of industry generally. Capital to finance industrial construction is not as readily available as it is for other purposes. Banks and insurance companies are limited by statute in making mortgage loans. §§ 36-70, 36-99, 38-143. Without additional help of an emergency nature, the industrial growth of the state is likely to be impeded and the economy of the state vitally affected.

The act itself does not contain a specific statement of the public purpose sought to be achieved by it. It therefore becomes necessary to consider the entire act to ascertain whether such a purpose can be determined from it. It cannot be denied that the prosperity of this state and the general welfare

of its public are dependent upon a healthy, growing industrial complex, diversified in character, housed in modern, up-to-date facilities geared to the technological advances of our times. Providing gainful employment for our people will increase their purchasing power, improve their living conditions, relieve the demand for unemployment or welfare assistance and advance the general economy. New or modernized buildings will add properties to the tax lists and increase the tax base to the general good of the community. That the industry which seeks an insured mortgage may initially benefit by the program because it stimulates the availability of otherwise unattainable financing, or that the mortgagee, who without such insurance would be unable to provide a loan to the extent permitted by the act, could in the event of default call upon the building commission to redeem his investment, is incidental to the prime purpose of the act and is not sufficient to defeat it. *Lyman* v. *Adorno,* 133 Conn. 511, 516, 52 A.2d 702. We conclude that the act sufficiently states a public purpose and is not unconstitutional by reason of the fact that the purpose is not spelled out with clarion specificity. *Barnes* v. *New Haven,* 140 Conn. 8, 17, 98 A.2d 523.

The commission is an administrative agency of the state. Throughout the years, the number of such agencies has increased in both the federal and the state governments because the problems facing legislative bodies are such that without the agencies many important laws beneficial to the public need could not be administered. In creating an agency to administer a law complete in itself and designed to accomplish a particular purpose, the legislature must establish primary standards to carry out the law or lay down an intelligible principle to which

the agency must conform, although the agency may be authorized to adopt rules and regulations to execute the provisions of the law. *Jennings* v. *Connecticut Light & Power Co.,* 140 Conn. 650, 670, 103 A.2d 535; *State* v. *Stoddard,* 126 Conn. 623, 628, 13 A.2d 586. The building commission has been granted the authority to make rules. It is necessary to examine the act to see if it contains sufficient standards or lays down a principle to guide the commission in deciding whether prospective mortgagors and mortgagees are entitled to have the state guarantee the loans. In this connection, reference may be made to the task assigned to the credit corporation. All applications must be submitted to it for investigation and report. § 32-15. In addition to any other factors deemed relevant by the commission, the credit corporation must as a minimum ascertain and report such facts about the company under consideration as its history, wage standards, job opportunities, stability of employment, past and present financial condition and structure, pro forma income statements, present and future markets and prospects, and integrity of management. Other information which the credit corporation deems relevant to the situation may be incorporated in the report, and it is to include the corporation's opinion on whether the company would contribute to the development and advancement of the business prosperity and economic welfare of the state. The attitude of the corporation is not binding on the commission. The report is advisory only. The corporation may influence the commission but it cannot control it. And neither can the development commission, which also is given a part to play in this attempt to bolster the state's industrial position.

The development commission was created in 1939. Cum. Sup. 1939, § 798e. While its duties have been expanded in the years since then, its original and still prime purpose is to promote Connecticut and to aid in the development and growth of the state and its economy. General Statutes, §§ 32-3, 32-7. Its work is closely related to the purposes sought to be achieved by the industrial building commission act. Hence, the reason for having a copy of each application for insurance sent to the development commission is so that it may become familiar, if it is not already, with the contemplated industrial project and, if it wishes, make a report to the building commission, after receiving a copy of the report of the credit corporation.

The credit corporation is a private corporation, with distinct public overtones, created by special act in 1953. 26 Spec. Laws 1002. Its charter has been amended from time to time. 27 Spec. Laws 348; 29 Spec. Laws 487; 30 Spec. Laws 235. Its principal purpose is to assist, encourage, develop and advance the business prosperity and economic welfare of this state, and the manner in which it can do so is spelled out in its charter. It is authorized to loan money and furnish credit to qualified applicants for the promotion, development and conduct of all kinds of business activity in this state and in addition to guarantee the obligations of those it elects to assist financially. 26 Spec. Laws 1002, § 3. Its participation in such ventures is limited to ten times the amount of its paid-in capital and surplus. 29 Spec. Laws 487, § 3. The stipulation for reservation makes no reference to the extent of the experience of the credit corporation in investigating the background and prospects of applicants to it for financial assistance or the limita-

tions on its activity in the loan market, but it is reasonable to assume that the legislature, having created the credit corporation specially to function in a field kindred to that for which the building commission was created, ascertained that the credit corporation had developed a trained staff which had acquired, for investigating applications for aid, a "know how" which could be utilized beneficially by the commission, without the necessity of burdening the mortgage insurance fund with the cost of an organization to do this vital work. It may also be assumed that the legislature was cognizant of the practice on the part of prospective mortgagees in the mortgage finance field of causing investigations to be made of applicants for mortgages and of the fact that the mortgagees rely on the results of these surveys to determine whether the applications warranted approval. As the legislature could have authorized the commission to employ qualified outside agencies to make investigations and reports to it; see § 13-161; we fail to see why the legislature could not designate the credit corporation to act in this capacity. That it would receive an incidental benefit by being paid the actual cost of the investigations and reports is not sufficient to render the provision unconstitutional, so long as the act itself serves a public purpose. *Snyder* v. *Newtown,* 147 Conn. 374, 382, 161 A.2d 770, cert. denied, 365 U.S. 299, 81 S. Ct. 692, 5 L. Ed. 2d 688, and cases cited therein.

Upon receipt of the reports of the credit corporation and the development commission, if the latter has made one, the building commission must give consideration to them. After such other action as the building commission deems appropriate, it acts on the application for insurance but cannot

approve it unless the project is found to be financially sound. § 32-15. The commission, in arriving at its conclusion, not only has to consider the factors enumerated in the report of the credit corporation relative to the stability of the project and its sponsor but to decide that the mortgage (1) is one made and held by an approved mortgagee, responsible and able to service the mortgage properly; (2) involves a principal obligation not in excess of $5,000,000 for any one project and not exceeding 90 percent of the cost of the project; (3) has a maturity within three-quarters of the remaining useful life of the property but not more than twenty-five years; (4) contains complete amortization provisions requiring periodic payments within the ability of the mortgagor to pay; and (5) contains essential provisions as to property insurance, repairs, taxes, default and similar matters. § 32-16. The act sufficiently enunciates the principle that before a mortgage can be insured the mortgagor must pass muster, the mortgagee must be reliable and responsible and the project must be financially sound. Fly-by-night operators and shaky propositions are not to be encouraged. Some latitude must be given the commission in deciding in what geographical areas the program can be put to work to advantage and what kinds of endeavor would add stimulus to the industrial life of the state. The act is not an illegal delegation of legislative authority to either the commission or the credit corporation. *West* v. *Egan,* 142 Conn. 437, 442, 115 A.2d 322.

"A public use defies absolute definition, for it changes with varying conditions of society, new appliances in the sciences, changing conceptions of the scope and functions of government, and other

differing circumstances brought about by an increase in population and new modes of communication and transportation. . . . Courts as a rule, instead of attempting judicially to define a public as distinguished from a private purpose, have left each case to be determined on its own peculiar circumstances. . . . The modern trend of authority is to expand and liberally construe the meaning of 'public purpose.' The test of public use is not how the use is furnished but rather the right of the public to receive and enjoy its benefit. . . . [W]hat constitutes a public purpose is primarily a question for the legislature, and its determination should not be reversed by the court unless it is manifestly and palpably incorrect." *Barnes* v. *New Haven,* 140 Conn. 8, 15, 98 A.2d 523.

We answer "No" to all the questions in the reservation.

In this opinion SHEA, COMLEY and THIM, Js., concurred; ALCORN, J., dissented, expressing the view that the second question should be answered in the affirmative.