GREGORY MARINA, INC., v. CITY OF DETROIT

DECISION OF THE COURT.

1. MUNICIPAL CORPORATIONS—INJUNCTION—MARINA—PUBLIC PURPOSE—BUSINESS ENTERPRISE.

Order of trial court granting injunction to owner of marina and others against home-rule city to prevent latter from construction of city-owned marina in which boat wells would be leased under nontransferable perpetually renewable leases for summer season, such being found to be a public purpose but a business enterprise requiring approval of the electors, is ordered reversed: by DETHMERS and O'HARA, JJ., on ground that project was a public improvement specifically authorized by statute, and by T. M. KAVANAGH, C. J., and BLACK and SMITH, JJ., on ground that project was not a business enterprise requiring approval of electorate pursuant to home-rule act and charter provisions; KELLY and SOURIS, JJ., dissenting on ground that a marina so restricted was not

---

REFERENCES FOR POINTS IN HEADNOTES

[1, 4–7, 15, 23, 24, 36] 37 Am Jur, Municipal Corporations §§ 119, 120, 136 et seq.
[2, 21, 33–35] 43 Am Jur, Public Securities and Obligations § 52 et seq.
[3, 25] 30A Am Jur, Judgments § 335.
[8–13] 37 Am Jur, Municipal Corporations §§ 119, 120.
[14] 5 Am Jur 2d, Appeal and Error § 1009.
[16–19, 39, 40] 16 Am Jur 2d, Constitutional Law § 227 et seq. 50 Am Jur, Statutes § 44.
[20] 16 Am Jur 2d, Constitutional Law § 225.
[22, 29] 20 Am Jur, Evidence § 16 et seq.
[26, 27, 43–46] 37 Am Jur, Municipal Corporations §§ 114, 115.
[28] 28 Am Jur, Initiative, Referendum and Recall § 11.
[30, 31] 56 Am Jur, Wharves § 30 et seq.
[32, 41, 42] 56 Am Jur, Wharves § 24.
[37] 38 Am Jur, Municipal Corporations § 712.
[38] 48 Am Jur, Shipping § 223.

a constitutional public purpose for which tax moneys could be expended, and ADAMS, J., dissenting because project was a business enterprise requiring approval of electorate (Const 1908, art 8, §§ 20, 25; Const 1963, art 7, §§ 21, 26; CL 1948, § 117.5[e]; § 141.101 *et seq.*, as amended; Detroit City Charter, title 3, chap 1, § 12[h]).

DISSENTING OPINION.

KELLY and SOURIS, JJ.

2. STATUTES—REVENUE BOND ACT—CONSTITUTIONAL LAW—PUBLIC IMPROVEMENTS—PUBLIC PURPOSE—MUNICIPAL CORPORATIONS.

*Definition of revenue bond act defining public improvements to include "yacht basins, harbors, docks, wharves" does not violate or change constitutional provisions which require municipal expenditures to be used for public or municipal purposes, and does not change the law as to what constitutes a public purpose (CL 1948, § 141.101 et seq., as amended).*

3. APPEAL AND ERROR—FINDING OF TRIAL COURT—RES JUDICATA.

*Finding of trial court that previous case between present plaintiff's alleged predecessor in interest and defendant city in same court and concerning substantially the same issues as the present case was not* res judicata *and determinative of the issues in this case is* held, *not dispositive of appeal in present case in Supreme Court.*

4. MUNICIPAL CORPORATIONS — CONSTRUCTION OF MARINA — PUBLIC PURPOSES.

*City and State can jointly construct a marina provided the project constitutes a "public purpose".*

5. SAME—CONSTITUTIONAL LIMITATIONS—PUBLIC PURPOSES.

*The Constitution requires municipal expenditures to be used for "public purposes" (Const 1908, art 8, §§ 20, 25; Const 1963, art 7, §§ 21, 26).*

6. SAME—CONSTITUTIONAL LIMITATIONS—PUBLIC PURPOSES.

*The city may not construct a marina at a large expenditure to taxpayers for the use and benefit of a limited number of individuals, through leasing of boat wells on a seasonal basis with perpetual option of renewal, as such expenditure would not be for a public purpose.*

7. SAME—DEVELOPMENT OF HARBOR—PUBLIC INTEREST.

*The development by a city of its harbor, including the building of docks and wharves to accommodate transient watercraft*

*traffic, is a project in the public interest, and constitutes a public use or purpose, the promotion of service to the public being considered the primary object of such a development.*

8. WORDS AND PHRASES—PUBLIC USE.

*A public use changes with changing conditions of society, new appliances in the sciences, and other changes brought about by an increase in population and by new modes of transportation and communication.*

9. MUNICIPAL CORPORATIONS—PUBLIC PURPOSE.

*Generally, a public purpose has for its objective the promotion of the public health, safety, morals, general welfare, security, prosperity and contentment of all the inhabitants or residents within the municipal corporation, the sovereign powers of which are used to promote such public purpose.*

10. SAME—PUBLIC USE—STATE AND MUNICIPAL ACTIVITIES.

*The modern trend of decisions is to expand and liberally construe the term "public use" in considering State and municipal activities sought to be brought within its meaning.*

11. WORDS AND PHRASES—PUBLIC USE.

*The test of public use is not based upon the function or capacity in which or by which the use is furnished, but rather the right of the public to receive and enjoy the benefit of the use determines whether the use is public or private.*

12. MUNICIPAL CORPORATIONS — PUBLIC PURPOSE — PRIVATE ENTERPRISE.

*Determination of whether a municipal activity is for a public purpose involves consideration of whether the need to be met in its nature requires united effort under unified control, or can be served as well by separate individual competition; and whether private enterprise has in the past failed or succeeded in supplying the want or in eradicating the evil.*

13. SAME—PUBLIC PURPOSE.

*Determination of whether a municipal activity is for a public purpose involves a consideration of whether the benefit is available on equal terms to the entire public in the locality affected, whether the service or commodity supplied is one needed by all or by a large number of the public, and whether the enterprise bears directly and immediately, or only remotely and circumstantially upon the public welfare.*

14. COSTS—MUNICIPAL CORPORATIONS—CONSTRUCTION OF MARINA.
    *No costs are allowed in suit to determine right of city to construct
    and operate a marina, a public question being involved.*

15. MUNICIPAL CORPORATIONS—PUBLIC PURPOSE—INJUNCTION.
    *City's proposed marina for summer accommodation of boat owners
    who would have nontransferable perpetual renewal seasonal
    leases of boat wells held, not a public purpose for which city
    or State tax moneys may be expended, hence, construction
    should be enjoined (Const 1908, art 8, §§ 20, 25; Const 1963,
    art 7, §§ 21, 25; CL 1948, § 141.101 et seq.).*

SEPARATE OPINION.

T. M. KAVANAGH, C. J., and BLACK and SMITH, JJ.

16. CONSTITUTIONAL LAW—LEGISLATURE—POWERS—PUBLIC PURPOSE.
    *The new provision of the 1963 Michigan Constitution concerning
    public health and general welfare, together with the traditional
    policy of this State, limits the powers of the legislature and
    of government generally to such legislative acts and such
    governmental powers as exhibit a public purpose (Const 1963,
    art 4, § 51).*

17. WORDS AND PHRASES—PUBLIC PURPOSE—DEFINITION—DECLARA-
    TION OF LEGISLATURE.
    *The definition of "public purpose" is essentially the product of
    legislative determinations addressed to the purposes of govern-
    ment, and, subject to specific constitutional limitation, when
    the legislature has spoken, the public interest has been de-
    clared in terms well nigh conclusive.*

18. CONSTITUTIONAL LAW—PUBLIC PURPOSE—SOCIAL LEGISLATION.
    *The legislature, not the judiciary, is the main guardian of the
    public needs to be served by social legislation.*

19. SAME—PUBLIC PURPOSE.
    *Determination of what constitutes a public purpose involves con-
    siderations of economic and social philosophies and principles
    of political science and government, and such determination
    should be made by the elected representatives of the people.*

20. SAME—PUBLIC PURPOSE—LEGISLATIVE FUNCTIONS—COURTS.
    *The determination of what constitutes a public purpose is pri-
    marily a legislative function, subject to review by the courts
    when abused, and the determination of the legislative body
    of that matter should not be reversed except in instances where
    such determination is palpably and manifestly arbitrary and
    incorrect.*

21. MUNICIPAL CORPORATIONS—REVENUE BOND ACT—PUBLIC IMPROVE-
MENTS.

*The revenue bond act, in authorizing public improvements, pro-
vided that the term* public corporation *should be construed to
mean any city and that the term* public improvements *included
yacht basins and harbors and conferred the right to exercise
the powers granted even though no bonds were issued under
the act (CLS 1961, §§ 141.103, 141.104).*

22. EVIDENCE—JUDICIAL NOTICE—RECREATIONAL BOATING.

*Supreme Court takes judicial notice that recreational boating has
continued to be one of the leading outdoor pastimes in this
State.*

23. MUNICIPAL CORPORATIONS—PUBLIC PURPOSE—CONSTRUCTION OF
MARINA.

*The construction of a marina by a home-rule city* held, *clearly
to meet the test of* public purpose *formulated by courts.*

24. SAME—PUBLIC IMPROVEMENTS—PUBLIC USE.

*It is not essential that the entire community, not even any con-
siderable portion, should directly enjoy or participate in any
public improvement in order to constitute a public purpose in-
volved in the expenditure of funds raised by taxation.*

25. JUDGMENT—RES JUDICATA.

*Judgment in previous case between plaintiffs' alleged predeces-
sors in interest and defendant city involving similar issues
and never appealed* held, *not* res judicata *as to the issues of
the case because of new circumstances and changes in public
opinion and decisions in several States upholding the right
of cities to construct and operate marinas.*

26. WORDS AND PHRASES—BUSINESS ENTERPRISE—INVESTMENT OF
CAPITAL—PROFIT—CENTRALIZED MANAGEMENT AND CONTROL.

Business enterprise *is the investment of capital, labor, or man-
agement in an undertaking for profit and one of its recognized
attributes is centralized management and control.*

27. MUNICIPAL CORPORATIONS—BUSINESS ENTERPRISE—OPERATION OF
MARINA.

*The operation of a municipally owned marina is not necessarily
made a business enterprise by reason of the fact that a fee
is charged for the use of the facilities.*

28. SAME—CONSTRUCTION AND OPERATION OF MARINA—BUSINESS
ENTERPRISE.

*Construction and operation of marina by defendant city* held,
*not to be a business enterprise, requiring approval of the
electors, since it involves public health, recreation, and welfare,
as the city is discharging its obligation to provide adequate
and safe recreational facilities for its population (CLS 1961,
§ 117.5; Detroit City Charter, title 3, chap 1, § 12[h]).*

SEPARATE OPINION.

DETHMERS and O'HARA, JJ.

29. EVIDENCE—JUDICIAL NOTICE—WHARVES—SEASONAL USE OF MA-
RINA—SAIL OR POWER BOATS.

*Judicial notice is taken that seasonal rental of a mooring facility
for sail or power craft is inherently necessary to the operation
of either a public or private marina.*

30. WHARVES—ANNUAL RENEWAL—SAIL OR POWER BOATS.

*Annual renewal of the seasonal rental of a mooring facility is
inherently necessary to the operation of a marina and does
not result in unequal treatment of boat owners.*

31. SAME—OPERATION OF MARINA.

*The inherent nature of boating requires that a public marina
conform, in substance, to the practices of its privately oper-
ated counterpart, as there is no way to operate a marina
successfully and rent mooring space therein on a day-to-day
basis.*

32. SAME—OPERATION OF MARINA.

*Use of various judicially created tests of the "public purpose"
of a municipally owned marina are inapplicable, where the
legislature passed legislation declaring construction and opera-
tion of a marina to be a "public purpose" (CL 1948, § 141.101
et seq., as amended).*

33. STATUTES—REVENUE BOND ACT—MUNICIPAL CORPORATIONS—PUB-
LIC IMPROVEMENTS.

*The purpose of the revenue bond act was to "authorize public
corporations to construct * * * public improvements", and
the term "public improvements" specifically includes yacht
basins and harbors (CL 1948, § 141.101 et seq., as amended).*

34. MUNICIPAL CORPORATIONS—REVENUE BOND ACT—CONSTRUCTION
OF A MARINA.

*Contention that revenue bond act is not applicable to proposed
marina construction by city, since it is not to be financed with*

*revenue bonds* held, *not well taken, since the act itself authorizes powers therein granted to be exercised even though no bonds are issued (CLS 1961, § 141.104).*

35. SAME—STATE WATERWAYS COMMISSION ACT—MATCHING FUNDS.
*State waterways commission act authorizes cities by a majority vote of the legislative bodies to enter into contracts and agreements with the waterways commission for the purpose of joint construction of a marina to be paid for in part by matching funds of the commission (CL 1948, § 281.505).*

36. SAME—PUBLIC PURPOSES—HOME RULE ACT—CITY CHARTER.
*Once the trial court had found that the proposed project was a public purpose within the meaning of the revenue bond act, it was error to apply the provisions of the home-rule act and its adopted counterpart provision in the city charter, which require approval by 3/5 of the electors before the city may engage in any business enterprise requiring an investment in excess of 10 cents per capita, since the term "business enterprise" as used in the charter and home-rule act, and the term "public improvement" as used in the revenue bond act are mutually exclusive (CL 1948, §§ 117.5[e], 141.101 et seq., as amended; Detroit City Charter, title 3, chap 1, § 12).*

37. SAME—EQUITABLE RELIEF—COMPETITION WITH PRIVATE ENTERPRISE—COURTS.
*A protesting business interest or taxpayer cannot obtain relief by judicial action against a municipality which undertakes a statutorily designated "public improvement" which competes with and may adversely affect a similar private enterprise, so long as the municipal activity is specifically designated by statute as "public improvement" and the proof establishes that what is being undertaken conforms in fact with the legislative designation (CL 1948, § 141.101 et seq., as amended).*

38. WORDS AND PHRASES—YACHT BASIN—HARBOR—MARINA.
*The terms* yacht basin *and* harbor *are synonymous with* marina.

DISSENTING OPINION.
ADAMS, J.

39. STATUTES—PUBLIC PURPOSES—LEGISLATIVE FUNCTION.
*Determination of what constitutes a public purpose is primarily a legislative function.*

40. SAME—PUBLIC PURPOSES—CONSTRUCTION OF MARINA.
   *Determination by legislature that construction and operation of marinas by municipal corporations constitutes a public purpose held, proper.*

41. MUNICIPAL CORPORATIONS—MARINA—BUSINESS ENTERPRISE.
   *Construction, operation, and maintenance of a marina by a municipal corporation constitutes a "business enterprise" as those words are used in provisions of home-rule act and city charter (CLS 1961, § 117.5[e]; Detroit Charter, title 3, chap 1, § 12 [h]).*

42. SAME—PROPRIETARY CAPACITY—OPERATION OF PIER OR WHARF.
   *It is generally held that a municipality functions in a private or proprietary capacity in operating and maintaining a pier or wharf.*

43. SAME—BUSINESS ENTERPRISE—PROFIT.
   *The key word in defining a municipal business enterprise is not necessarily profit, which is too narrow a test.*

44. SAME—PROPRIETARY OR GOVERNMENTAL FUNCTION—STANDARDS.
   *Determination of whether a municipal service is a governmental or a proprietary activity should be made on whether it is conducted at a profit, whether the service is traditionally a governmental one, whether it is a mandatory duty imposed by the legislature, whether the activity is permissive, and whether the service is conducted in essentially the same manner as a private utility.*

45. SAME—BUSINESS ENTERPRISES.
   *Business enterprises of municipal corporations do not involve an imperative duty, or a duty imposed by the legislature; they may be for profit, they may impinge upon and compete with private enterprises, and they are conducted much like private business.*

46. SAME—MARINA—BUSINESS ENTERPRISE.
   *Construction and operation of marina by city in direct competition with private marinas held, a "business enterprise" within the meaning of the home-rule act and city charter provisions requiring a 3/5 vote of the electorate (CLS 1961, § 117.5[e]; Detroit Charter, title 3, chap 1, § 12[h]).*

Appeal from Wayne; Elliott (Philip), J., retiree, presiding. Submitted October 5, 1965. (Calendar

No. 10, Docket No. 51,075.) Decided August 24, 1966.

Complaint by Gregory Marina, Inc., a Michigan corporation, and others to enjoin the City of Detroit, a municipal corporation, from constructing a marina in George Engel Memorial Park. Judgment enjoining defendant from construction of marina until approval by electors. Defendant appeals, plaintiffs cross-appeal. Reversed.

*Dykema, Wheat, Spencer, Goodnow & Trigg* (*Donald E. Shely,* of counsel), for plaintiffs.

*Robert Reese,* Corporation Counsel, *John H. Witherspoon,* and *Roger P. O'Connor,* Assistants Corporation Counsel, for defendant.

*Amici Curiae:*

State of Michigan, by *Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *Nicholas V. Olds* and *Jerome Maslowski,* Assistant Attorneys General.

Michigan Association of Municipal Attorneys, by *Louis C. Andrews, Jr.,* Attorney for the Michigan Municipal League, *Ralph W. Harbert, Jr.,* City Attorney of Battle Creek, *Thomas C. Shearer,* Assistant City Attorney of Grand Rapids, and *Fred Steingold,* Assistant City Attorney of Ann Arbor.

KELLY, J. *(dissenting).* Plaintiffs' challenge to the validity of defendant city of Detroit's right to construct a $1,365,000 marina on the Detroit river, resulted in a Wayne county circuit court order finding and holding that:

"(a) The case of Edward Gray, Inc. v. City of Detroit [circuit court for the county of Wayne, in chancery, # 175,077] is not *res judicata* and determinative of the issues in this cause, and

"(b) The construction, operation and maintenance of the proposed city marina will constitute a public purpose, and

"(c) The city of Detroit is required under title 3, chapter 1, § 12 of the charter of the city of Detroit and also under section 5 (e) of the home-rule act, CLS 1961, § 117.5(e) (Stat Ann 1963 Cum Supp § 5.2084[e]) to secure approval of three-fifths of the electors voting thereon at any general or special election before it engages in any business enterprise requiring an investment of money by the city in excess of 10 cents per capita, and

"(d) The proposed city marina constitutes a business enterprise within the aforementioned provisions of the city charter and home-rule act, the cost to the city of which will exceed 10 cents per capita, and

"(e) The vote requirements of the aforementioned city charter and home-rule act have not been amended, deleted, or nullified by the revenue bond act of 1933, as amended, CL 1948, § 141.101 *et seq.* (Stat Ann § 5.2731 *et seq.*), and

"(f) The city of Detroit having failed to secure approval of three-fifths of the electors in accordance with the aforementioned provisions of the city charter and home-rule act.

. "It is ordered and adjudged that defendant, city of Detroit, its agents, servants, employees and attorneys be, and they hereby are, enjoined and restrained from proceeding with the erection, construction, completion, or operation of the proposed marina in George Engel Memorial Park and from proceeding with the execution, approval, or performance of any contract or structural plan with respect thereto, until approved by the electors of the city of Detroit in accordance with the aforementioned provisions of the city charter and home-rule act."

Appellees in a cross-appeal challenge the court's finding in paragraph (a), that the Gray Case is not *res judicata,* and the finding in paragraph (b) that the marina will constitute a public purpose. Appellant places in issue the court's finding under paragraph (f), namely, that the city must secure approval of three-fifths of the electors before constructing the proposed marina.

The State of Michigan through its waterways commission agreed on December 2, 1960, to pay one-half of the cost of construction of the proposed marina not to exceed $800,000. The attorney general and the Michigan Association of Municipal Attorneys have filed briefs *amicus curiae.*

Plaintiff Kean Estates Corporation at the time of trial operated a 319-well marina on the Detroit river, at 100 Meadowbrook, Detroit; had completed 35 new wells during the last year or two and had 30 additional wells nearing completion. It paid approximately $24,000 in taxes to the city of Detroit in 1963.

Plaintiff Gregory Marina, Inc., has operated a marina on the Detroit river since 1914. At the time of trial it had 128 boat wells and in 1964 paid taxes to the city of Detroit in the approximate sum of $20,000.

Plaintiffs contend: (1) That the case of Edward Gray, Inc. *v.* City of Detroit is *res judicata* and determinative of the issues in this case; (2) That the construction, operation, and maintenance of the proposed city marina is not for a public purpose because (a) the benefit is not available on equal terms to the entire public in the locality affected, and (b) the enterprise bears only remotely and circumstantially upon the public welfare; also (3) That the project has not been approved by three-fifths of the electors of the city of Detroit as required by the city charter.

Plaintiff in the case of Edward Gray, Inc. *v.* City of Detroit owned a parcel of land known as "Gray-harbor," which was involved in that case. The property of present plaintiff Gregory Marina, Inc., is located on the same parcel of land, namely, "Grayharbor."

In the Gray Case, the plaintiff sought an injunction to restrain the city of Detroit from constructing and operating a marina on another city park in Detroit. In this appeal, appellant, city of Detroit, admits in its brief that "The city proposed [in the Gray Case] to operate the marina in substantially the same manner as it proposes to operate the marina in the present case."

In ruling against the city in the Gray Case on the question of whether the marina is for a public purpose—a main issue in this present appeal—the lower court stated:

"Can it be said that the construction of these wells is for the benefit of the general public or for the benefit of that portion of the public owning motor boats? I understand the rule to be that a public purpose is one where it is possible for all people of a class to have equal rights and equal use of the public improvement. That will not be true in this case. * * * The same condition would arise if, for instance, the city of Detroit constructed a public garage and then leased stalls in such garage to a certain number of owners of automobiles for a year or any definite or long extended time. Or, if the city of Detroit constructed a golf course, which they have done and there is no doubt of their authority to do so, and then sold exclusive memberships therein to a limited number of people so that the general golf playing public could not have access to the grounds. Possibly if these boat wells were to be operated for use from day to day or something of that sort, where the general public might have an opportunity to use them, the difficulty might

be obviated. It is true on golf courses only a limited number of persons can play each day but at all times the public have equal opportunity to play on such courses. That would not be true and cannot be true in the present instance. * * * An entirely different state of facts exists under the proposed plan than would apply to the construction of golf courses or even wharves where any boat may tie up. It seems to me that the only reasonable deduction that can be drawn from the testimony in this case is that the city of Detroit is undertaking to construct at a large expense to taxpayers, boat wells for the permanent or semipermanent use of an exceedingly limited number of individuals. Not only does this plan open the door to unjust discrimination and political maneuvering but it is taxing the general public for the benefit of a selected few of a large class of citizens."

Present plaintiff Gregory Marina, Inc., claims it is in privity with plaintiff Gray by reason of ownership; that the city did not appeal the Gray judgment, and that we should apply the doctrine of *res judicata* as defined in *Skinner* v. *Argentine Township Board*, 238 Mich 533, where we said (pp 537, 538):

"The doctrine of *res judicata* is defined to be: 'that an existing final judgment or decree rendered upon the merits, and without fraud or collusion, by a court of competent jurisdiction, upon a matter within its jurisdiction, is conclusive of the rights of the parties or their privies, in all other actions or suits in the same or any other judicial tribunal of concurrent jurisdiction, on the points and matters in issue in the first suit.' 15 RCL, p 950, § 429."

Defendant city answers by stating that because of changes in the law, namely, the enactment of the revenue bond act of 1933,[1] and decisions in Michigan

---

[1] CL 1948 and CLS 1961, § 141.101 *et seq.* (Stat Ann 1958 Rev and Stat Ann 1961 Cum Supp § 5.2731 *et seq.*).

and other jurisdictions upholding the right of cities to construct and operate marinas, the Gray Case does not control the issues in this cause.

The revenue bond act of 1933 defines public improvements to include "yacht basins; harbors; docks; wharves."

The revenue bond act of 1933 did not violate nor change the provisions of our Constitution which require municipal expenditures to be used for public or municipal purposes.

The revenue bond act of 1933 does not change the law as to what constitutes a public purpose.

Defendant's motion for summary judgment involving the question as to whether the revenue bond act overruled the Gray Case was denied with a correct summation by the trial court, as follows:

"The whole argument of the city of Detroit is based on the fact that the passage of the revenue bond act of 1933 supersedes this case of Edward Gray, Inc., v. City of Detroit. This revenue bond act does grant authority to public corporations to construct yacht basins, harbors, docks, wharves, et cetera. However, this revenue bond act must be construed to mean that the construction of these yacht basins, harbors, docks, and wharves must be for a public purpose. Otherwise, this act would contravene the Constitution of the State of Michigan which says that cities cannot tax their people except for public purposes."

After an extensive trial, all parties stress the importance of our decision. We agree that the question in re "public purpose" should not be resolved on a circuit court level and, therefore, we are not agreeing with plaintiffs that we dispose of this appeal by finding that "The case of Edward Gray, Inc. v. City of Detroit is res judicata and determinative of the issues in this cause." .

The Attorney General calls attention to the legislature's creation[2] of the Michigan waterways commission in 1947 (in which creation the writer of this opinion took an active part) providing for "the acquisition, construction and maintenance of harbors and channels," and "the regulation and control of boating within the boundaries of this State"; that "the commission favored the construction of facilities for transient watercraft but that it would participate in the construction of seasonal facilities if no other means were available for providing seasonal wells for boat owners"; that "the State's position is that the definition of 'harbor' also embraces the concept of a marina, since these words are synonymous and may be defined as a protected place for storage, anchorage, and servicing of watercraft"; that "the waterways commission is authorized to participate with municipalities in marina programs" under section 5 of the 1947 Michigan waterways commission act.[3]

We agree with all of the above stated contentions of the attorney general. Nothing in this opinion challenges the right of the State and the city to jointly construct a marina.

We cannot agree with the position of the attorney general that we are not concerned with the question of public purpose because "the project here concerned constitutes a public purpose because expenditures have been authorized for its construction by the waterways commission under the waterways act."

The proposed marina will not be financed under the provisions of the revenue bond act, but with

---

[2] PA 1947, No 320 (CL 1948 and CLS 1961, § 281.501 et seq. [Stat Ann 1961 Rev § 3.534(1) et seq.]). See, currently, PA 1965, No 380, § 258 (CL 1948, § 16.358 [Stat Ann 1965 Cum Supp § 3.29 (258)]).—Reporter.

[3] PA 1947, No 320, § 5 (CL 1948, § 281.505 [Stat Ann 1961 Rev § 3.534(5)]).

taxpayers' money. Nothing in the 1947 waterways commission act even intimates that a marina could be built contrary to the Michigan Constitution which requires municipal expenditures to be used for public purposes. Constitution 1908, art 8, §§ 20, 25 (Constitution 1963, art 7, §§ 21, 26).

The question presented is not the right to construct the marina. The question is whether the city can restrict its use as planned. \

Appellant city admits the restricted use in its "statement of facts" as follows:

"The city plans to lease the boat wells in the marina to the public by the season on a first-come, first-served basis and annually thereafter upon the expiration and failure to renew any such lease or when such boat wells become available for any other reason."

Under the heading, "The benefit is not available on equal terms to the entire public in the locality affected," appellees describe the restriction (which is sustained by the record) as follows:

"The city proposes to convert land which is now available to the entire public for recreational purposes to a marina which will serve a much smaller classification—boat owners—who need not even be residents of Detroit or, for that matter, residents of the State of Michigan to qualify for a boat well. Businesses will be given the same right to lease wells as individuals. * * *

"The facilities will be leased on a seasonal basis to boat owners, each of whom will be granted a perpetual option to renew his lease. Defendant concedes that if a tenant wishes to stay for 20 years or longer he may do so. In January of each year the city will send out a notice and instructions on the manner of exercising the option. Permit holders are not permitted to assign their wells to anyone

else, and the same well is assigned to the permit holder each year.

"The general public is excluded from the facilities. No swimming, diving, or bathing is permitted in the marina.    Twenty-four hour watchman service, to keep out trespassers, is provided."

The briefs submitted disclose extensive survey of decisions in other States *in re* marinas, wharves, waterfront, and other improvements, appellant citing nine cases[4] and appellees three.[5]

A review of these 11 out-of-State opinions discloses that the question as to whether a city may construct and lease boat wells in a marina to a limited few of the public and not the general public was not raised in any of these cases.    While the decisions in some of these cases approved the construction of a marina or yacht basin, the public purpose issue was not directly raised in any of the cases except the Rhode Island case of *In Opinion to the Governor,* 76 RI 365 (70 A2d 817).

The court in this Rhode Island case, after stating (p 368), "The question upon which we are asked to give our advisory opinion is narrow.    Briefly it is whether the projects above referred to constitute public purposes in the constitutional sense," said (pp 369–371):

"It seems to be well settled that ordinarily the development by a city of its harbor, including the

---

[4] *Allydonn Realty Corp.* v. *Holyoke Housing Authority,* 304 Mass 288 (23 NE2d 665); *In Opinion to the Governor,* 76 RI 365 (70 A2d 817); *Laret Investment Co.* v. *Dickmann,* 345 Mo 449 (134 SW2d 65); *Miller* v. *City of St. Augustine* (Fla), 97 S2d 256; *Nelson* v. *DeLong,* 213 Minn 425 (7 NW2d 342); *Panama City* v. *State of Florida* (Fla), 93 S2d 608; *State* v. *City of Clearwater* (Fla), 184 So 790; *Puget Sound Power & Light Co.* v. *City of Seattle,* 291 US 619 (54 S Ct 542, 78 L ed 1025); *Ventura Port District* v. *Taxpayers,* 53 Cal 2d 227 (347 P2d 305, 1 Cal Rptr 169).

[5] *Allydonn Realty Corp.* v. *Holyoke Housing Authority,* 304 Mass 288 (23 NE2d 665); *Mayor and City Council of Baltimore* v. *Baltimore Steam Packet Co.,* 164 Md 284 (164 A 878); *Union City Housing Authority* v. *Commonwealth Trust Co.,* 25 NJ 330 (136 A2d 401).

building of docks and wharves, is a project in the public interest and constitutes a public use or purpose. The promotion of service to the public is considered to be the primary object of such a development. * * *

"In relation to the project of the marina the act before us is fairly comprehensive in scope. With reference to its purpose and to the city of Newport the act specifically refers therein to the 'increase of its commerce,' as well as to 'the improvement of its health and living conditions,' and clearly applies to all of a certain class without discrimination by providing that there be set up appropriate facilities for servicing yachts and pleasure boats of all types. Moreover, the act in effect deals primarily with an additional facility in the development of Newport harbor by the establishment therein of a yacht basin and if necessary the construction of a pier or piers in connection therewith. In our opinion such provisions clearly have for one of their chief objects the providing of a safe and convenient place for the anchorage and docking of yachts and pleasure boats, thereby in particular aiding in the regulation and control of harbor traffic, which is increased from time to time by the presence of numerous government vessels."

The Rhode Island case is not helpful to this decision as it did not involve the right to use taxpayers' money to build a facility to be used by a restricted number, such as is presented in this appeal.

In 1934 this Court[6] upheld the constitutionality of the revenue bond act and permitted the city of Traverse City to construct a yacht basin, storage yard for boats, and other recreational facilities under the provisions of the act, but that decision did not consider the question now before us, namely,

[6] *Gilbert* v. *City of Traverse City*, 267 Mich 257.

whether the facilities there involved were for a public purpose.

Two decisions *in re* "public use" are recognized by appellant, appellees, and this Court, as worthy of serious consideration, namely: *Hays* v. *City of Kalamazoo,* 316 Mich 443 (169 ALR 1218), and *Allydonn Realty Corp.* v. *Holyoke Housing Authority,* 304 Mass 288 (23 NE2d 665).

Appellant city calls to our attention the following from the *Hays Case* (pp 453, 454):

" 'A public use changes with changing conditions of society, new appliances in the sciences, and other changes brought about by an increase in population and by new modes of transportation and communication. The courts as a rule have attempted no judicial definition of a public as distinguished from a private purpose, but have left each case to be determined by its own peculiar circumstances. Generally, a public purpose has for its objective the promotion of the public health, safety, morals, general welfare, security, prosperity, and contentment of all the inhabitants or residents within the municipal corporation, the sovereign powers of which are used to promote such public purpose. The phrase "municipal purpose," used in the broader sense, is generally accepted as meaning public or governmental purpose as distinguished from private. The modern trend of decision is to expand and liberally construe the term "public use" in considering State and municipal activities sought to be brought within its meaning. The test of public use is not based upon the function or capacity in which or by which the use is furnished. The right of the public to receive and enjoy the benefit of the use determines whether the use is public or private.' "

Appellees answer:

"Appellant cites *Hays* v. *City of Kalamazoo,* 316 Mich 443, 453, 454 (1947) for the proposition that

'the modern trend of decision is to expand and liberally construe the term "public use".' We do not disagree with this statement nor with holding or reasoning of the *Hays Case.* We vigorously submit that this Court should closely examine and apply the last sentence of the language quoted from the *Hays Case* cited at page 8 of appellant's brief:

" 'The right of the public to receive and enjoy the benefit of the use determines whether the use is public or private.'

"This test, from the *Hays Case,* is really the test which was utilized by Judge Covert in the Gray Case in holding that the marina there in issue was not for a public purpose. We hasten to add that the Gray Case is not only *res judicata* but is the only direct legal precedent cited by either party which is on all fours with the facts in the instant case."

The Massachusetts decision in the *Allydonn Realty Corporation Case* involved a public housing question and in their briefs both appellant and appellees ask this Court to consider the following from that case (p 293):

"Some of the factors which the cases suggest as proper to be considered are these: Whether the benefit is available on equal terms to the entire public in the locality affected; whether the service or commodity supplied is one needed by all or by a large number of the public; whether the enterprise bears directly and immediately, or only remotely and circumstantially, upon the public welfare; whether the need to be met in its nature requires united effort under unified control, or can be served as well by separate individual competition; whether private enterprise has in the past failed or succeeded in supplying the want or in eradicating the evil; whether, insofar as benefits accrue to individuals, the whole of society has an interest in having those individuals benefited; whether a proposed extension

of governmental activity is in line with the historical development of the Commonwealth and with the general purpose of its founders; whether it will be necessary to use public ways or to invoke the power of eminent domain; whether a special emergency exists, such as may be brought about by war or public calamity. It is hardly necessary to say that the foregoing considerations are in no sense to be regarded as exclusive of others, and that great weight or little or no weight may be attached to some of them according to the presence or absence of others, or of still other conditions not hereinbefore enumerated."

Appellant cites this Massachusetts case to sustain its contention that, "The courts tend to use the terms 'public purpose' and 'public use' interchangeably," and concludes that:

"Although the court in the Allydonn public housing case suggested many elements to be considered in determining a public purpose, they are not the only elements or the principal elements to be considered in determining whether a marina constitutes a public purpose."

Appellees, after quoting from the Massachusetts case, state:

"Tested by these criteria, the facts of the instant case establish that the proposed marina to be built in George Engel Memorial Park is not for a public purpose."

Passing judgment on the important question: *"Does the construction, operation and maintenance of the proposed city marina on George Engel Memorial Park constitute a public purpose,"* the trial court found:

"The court believes that a case has been made out, although in some aspects not strong, that

the construction and maintenance of a city marina
is not barred because it is not a public purpose."

We cannot agree with the trial court. We agree
with the decision in the Gray Case when the same
issued was presented as is here presented, and the
trial court decided that:

"It seems to me that the only reasonable deduction
that can be drawn from the testimony in this case
is that the city of Detroit is undertaking to construct
at a large expense to taxpayers, boat wells for the
permanent or semipermanent use of an exceedingly
limited number of individuals. Not only does this
plan open the door to unjust discrimination and
political maneuvering but it is taxing the general
public for the benefit of a selected few of a large
class of citizens."

The trial court in the instant case, recognizing the
importance of the "public purpose" test, stated:

"All counsel in this case agree that the proposed
project must be for a public purpose if the city has
the power and the right to construct and maintain
a marina."

We reverse the holding of the lower court on the
public purpose issue and remand with instructions
that an order be entered restraining the construc-
tion of the proposed marina. No costs, a public
question being involved.

*Addendum.*

Chief Justice KAVANAGH's challenge of this
Court's right to pass judgment on the question of
public purpose, as evidenced by the following, is the
main reason for this addendum:

"Such determinations (what constitutes a public
purpose) should be made by the elected representa-
tives of the people. This seems so obvious that it
is surprising to see so many Michigan cases which

apparently take the opposite view. * * * Any authority in Michigan, supporting the proposition that public purpose is a judicial question, rests, ultimately, on dicta of ancient vintage. * * * The legislature, whose wisdom we cannot question, has decided that the public interest would be served by the governmental construction of harbors or yacht basins or, if you will, marinas. * * * Since the legislature whose business it is, said that constructing and operating a marina is a public purpose, we agree with the trial court which decided that construction of a marina by the city of Detroit constitutes a public purpose."

' The record proves that the legislature did not in any way express approval of projects such as the presently contemplated Detroit common council-waterways commission $1,600,000 marina.

When the legislature in 1947 created the Act[7] we are concerned with in this appeal, it made known its objective of aiding and encouraging transient watercraft traffic, and the fact that the waterways commission is and was aware of that fact is established by the attorney general's statement that:

"Although the commission is concerned with the construction of 15 harbors of refuge authorized by Congress, it has not confined itself entirely to that project since the demands of recreational boatmen have resulted in a State-local program providing for the *construction of mooring facilities for transient boatmen.*" (Emphasis ours.)

Also, by the waterways commission's director, Keith Wilson, who testified:

"In general, the commission participates only in the construction of facilities either for trailer board craft or for transients, watercraft visiting an area."

[7] Waterways commission act (PA 1947, No 320 [CL 1948 and CLS 1961, § 281.501 *et seq.* (Stat Ann 1961 Rev § 3.534(1) *et seq.*)]),

Commission Director Wilson justified his making
an exception to this commission rule because of ne-
cessity, but the record does not sustain such neces-
sity. On the contrary, the record sustains appellees'
statement that:

"Private enterprise has met its responsibilities to
the boating public over the years and continues to
do so. * * * Since 1959 there have been 1,500
new wells constructed in the St. Clair Shores area
by private enterprise."

The dissenting opinions stress the fact that the
legislature mentioned the words "harbors" and
"yacht basins." Chief Justice KAVANAGH states:
"The legislature, whose wisdom we cannot question,
has decided that the public interest would be served
by the governmental construction of harbors or
yacht basins or, if you will, marinas." Justice
O'HARA states: "Passing now to the public purpose
question. In Michigan, constructing and operating
a marina is a 'public purpose' because the legislature,
whose business it is, said so."

I cannot agree with my Brothers. In 1933[8] the
legislature included yacht basins, harbors and docks,
as "public improvements" that could be financed by
revenue bonds, but did not mention marinas. Four-
teen years later when the legislature created the
waterways commission act, the legislature not only
failed to mention "marina," but did not mention the
words majored in my Brothers' dissents, namely
"yacht basins."

Appellant and appellees offered considerable testi-
mony on the question of public purpose and reviewed
decisions, not only of our Court but the courts of
other States, and established the Court's right and
duty to determine whether the project met the test

---

[8] Revenue bond act of 1933 (CL 1948 and CLS 1961, § 141.101
*et seq.* [Stat Ann 1958 Rev and 1961 Cum Supp § 5.2731 *et seq.*]).

of public purpose. This appeal came to our Court with no one claiming that legislative action prevented judicial review.

After an extensive and well prepared joint appendix, appellant and appellees agreed on three questions to be presented to our Court for decision, one of those three questions being:

"Does the construction, operation and maintenance of the proposed city marina on George Engel Memorial Park constitute a public purpose?"

Appellant and appellees agreed in deciding this question that the Court should consider the answer to the following questions:

Is the marina available on equal terms to the entire public in the locality affected?

Is the service supplied by the marina needed by all or a large number of the public?

Does the marina bear directly or only remotely and circumstantially on the public welfare?

Has private enterprise in the past failed or succeeded in supplying the want or eradicating the evil?

Whether insofar as benefits accrued to individuals by building the proposed marina, has the whole society an interest in having those individuals benefited?

My Brother quotes article 4, § 51, of the 1963 Constitution providing that:

"The public health and general welfare of the people of the State are hereby declared to be matters of primary public concern. The legislature shall pass suitable laws for the protection and promotion of the public health,"

and states that the courts have held that it is not essential that the entire community or even any considerable portion should directly enjoy or par-

ticipate in any improvement in order to constitute a public use.

Answering, I call attention to our repeated quotation[9] from 37 Am Jur, Municipal Corporations, § 120, p 735, entitled "What Constitutes Public Purpose," as follows:

"The test of public use is not based upon the function or capacity in which or by which the use is furnished. The right of the public to receive and enjoy the benefit of the use determines whether the use is public or private."

Also, the following from appellees' brief:

"Appellant's basic argument on the public purpose issue is that the marina will benefit commerce, health, safety and navigation and that such benefits establish that the use is for a public purpose. * * *

"The fallacy of this argument is apparent when it is considered that the testimony of each of defendant's witnesses on the subject of commerce, health, safety and navigation would not be any different if the marina were to be established for an admittedly private purpose, for example, for the benefit only of the lawyers practicing law in Wayne county, Michigan."

Justice O'HARA in his dissenting opinion, states:

"The harried boat owner cannot come down daily to a publicly constructed and operated marina and ask for a slip or a buoy. * * * Owning a boat of the kind here involved, up to 26 feet overall, is almost as demanding as owning an elephant. * * * The non-trailered boat of the type above described is 'lifted' at the season's end. It is then stored either under a tarpaulin or in a building,

---

[9] *Hays* v. *City of Kalamazoo*, 316 Mich 443 (169 ALR 1218); *Younglas* v. *City of Flint*, 345 Mich 576, and *Sommers* v. *City of Flint*, 355 Mich 655.

but in either case at the marina. * * * Absent a place to store it at the marina when fall crispens the air, he can't leave it to the untender mercy of a Michigan winter, with the crunch of ice against the hull. He would have to move it by special motor carrier to some place where storage could be found. For these very inherent requirements the operation of a public marina must in substance conform to the practice in its privately operated counterpart."

Now, for the purpose of avoiding any confusion because of the above statements and to prove that the $800,000 of Detroit tax money and the $800,000 State tax money for the proposed marina here in issue, will not solve the boat owners' problems as he faces the winter but will cause him to turn to private enterprise to meet that situation, I quote the following from the testimony of the city's witness, Maxwell P. Craig:

"*Q.* Now, the marina, the wells at Memorial Park and at the proposed marina in George Engel are all open wells, are they not?
"*A.* They are.
"*Q.* That means that there is no covering over the top of them?
"*A.* Correct.
"*Q.* And you have, I take it, no room there for winter storage?
"*A.* No, sir.
"*Q.* How do the people get their boats out of the water at Memorial Park when October comes around?
"*A.* They go to—they go to private marina operators who have dry storage and make arrangements for their boats to be taken out and stored.
"*Q.* Do the private owners then come down with their regular—
"*A.* (Interrupting): They come down with the boats and tow these people's boats to their dry storage area.

"*Q.* The city has no winter storage facilities?

"*A.* None whatsoever.

"*Q.* And plans none?

"*A.* Correct."

We find no sanction for the proposed marina in either legislative or city charter enactments and, considering the issue from either the city of Detroit or the State taxpayers' standpoint, the proposed project does not meet the public purpose test and constitutes taxing the general public for the benefit of a selected few.

SOURIS, J., concurred with KELLY, J.

T. M. KAVANAGH, C. J. (*affirmed in part; reversed in part*). The city of Detroit, defendant and appellant in the above-entitled cause, proposes to construct and maintain a marina, consisting of approximately 265 boat wells, on one of its parks bordering on the Detroit river and known as the George Engel Memorial Park located at the foot of Fairview avenue in the city of Detroit. The State of Michigan, through its waterways commission, agreed on December 2, 1960, to pay one-half the cost of constructing the marina.

The city plans to lease the boat wells in the marina to the public by the season on a first-come, first-served basis, and annually thereafter upon the expiration and failure to renew any such lease or when such boat wells become available for any other reason.

Plaintiffs seek an injunction to restrain the city of Detroit from constructing the proposed marina.

The lower court held, in a written opinion dated October 13, 1964, that the case of Edward Gray, Inc. *v.* City of Detroit in the circuit court for the county of Wayne, in chancery, No. 175,077, was not

*res judicata* and determinative of the issues in this cause; that the proposed marina constitutes a public purpose; and that approval of the electors must be secured before constructing the marina.

Defendant city of Detroit is appealing the lower court judgment holding that approval of the electors must be secured before constructing the marina. Plaintiffs have cross-appealed the lower court's finding that the Gray Case is not *res judicata* and determinative of the issues in this case and that construction and operation of the proposed marina constitutes a public purpose.

The crucial issue in this case is whether the construction of the proposed marina constitutes a public purpose. Article 7, § 26 of the Constitution of 1963 specifically prohibits the lending of the credit of any city or village "except as provided by law, for any public purpose." Article 7, § 21, reads:

"The legislature shall provide by general laws for the incorporation of cities and villages. Such laws shall limit their rate of ad valorem property taxation for municipal purposes, and restrict the powers of cities and villages to borrow money and contract debts. Each city and village is granted power to levy other taxes for public purposes, subject to limitations and prohibitions provided by this constitution or by law."

Article 4, § 51, provides:

"The public health and general welfare of the people of the State are hereby declared to be matters of primary public concern. The legislature shall pass suitable laws for the protection and promotion of the public health."

This new section, together with the traditional public policy of this State, must be held to limit the powers of the legislature and of government

generally to such legislative acts and such governmental powers as exhibit a public purpose.

The question of what constitutes a public purpose has become doubly important because of another case presently before this Court—*City of Gaylord* v. *Gaylord City Clerk,* 378 Mich 273, involving the industrial development revenue bond act of 1963, PA 1963, No 62 (CL 1948, § 125.1251 *et seq.* [Stat Ann 1965 Cum Supp § 5.3533(21) *et seq.*]). In that case, too, the crucial question is whether Act No 62 and the program of the city of Gaylord thereunder exhibit a public purpose.

The United States Supreme Court, in discussing the police power and eminent domain power of congress, has admitted that:

"An attempt to define its reach or trace its outer limits is fruitless, for each case must turn on its own facts. The definition is essentially the product of legislative determinations addressed to the purposes of government, purposes neither abstractly nor historically capable of complete definition. *Subject to specific constitutional limitations, when the legislature has spoken, the public interest has been declared in terms well-nigh conclusive.* In such cases the legislature, not the judiciary, is the main guardian of the public needs to be served by social legislation, whether it be congress legislating concerning the District of Columbia (see *Block* v. *Hirsh,* 256 US 135 [41 S Ct 458, 65 L ed 865, 16 ALR 165]) or the States legislating concerning local affairs. * * * This principle admits of no exception merely because the power of eminent domain is involved. The role of the judiciary in determining whether that power is being exercised for a public purpose is an extremely narrow one." *Berman* v. *Parker,* 348 US 26, 32 (75 S Ct 98, 99 L ed 27). (Emphasis ours.)

Our highest court was even more candid in the case of *United States, ex rel. Tennessee Valley Au-*

*thority,* v. *Welch,* 327 US 546, 552 (66 S Ct 715, 90 L ed 843), where the court made this confession:

"But whatever may be the scope of the judicial power to determine what is a 'public use' in Fourteenth Amendment controversies, this Court has said that when congress has spoken on this subject 'Its decision is entitled to deference until it is shown to involve an impossibility.' *Old Dominion Co.* v. *United States,* 269 US 55, 66 (46 S Ct 39, 70 L ed 162). Any departure from this judicial restraint would result in courts deciding on what is and is not a governmental function and in their invalidating legislation on the basis of their view on that question at the moment of decision, a practice which has proved impracticable in other fields."

The United States Supreme Court's reasoning is flawless. For determination of what constitutes a public purpose involves considerations of economic and social philosophies and principles of political science and government. Such determinations should be made by the elected representatives of the people. This seems so obvious that it is surprising to see so many Michigan cases which apparently take the opposite view.

"Whether the use for which land is sought to be acquired by condemnation is a public one is a judicial question." *General Development Corporation* v. *City of Detroit,* 322 Mich 495, 498. Statements such as these, appearing regularly in our Michigan Reports can be traced back to several opinions of the Cooley Court in which the issue was never raised. In *People, ex rel. Detroit & Howell R. Co.,* v. *Township Board of Salem,* 20 Mich 452 (4 Am Rep 400), and *Ryerson* v. *Brown,* 35 Mich 333 (24 Am Rep 564), the Cooley Court, without discussing the preliminary issue of whether "public purpose" is a judicial or legislative question, proceeded to discuss

and judicially dispose of the matter. Any authority in Michigan, supporting the proposition that public purpose is a judicial question, rests, ultimately, on dicta of ancient vintage.

The only authority that ever discussed the question is found in *In re Hartwell,* 2 Brown's Michigan Nisi Prius Reports 97, 99, 100. In that case Judge Brown said:

"Indeed, I think it is quite as correct to say that *eminent domain* is the inherent right necessarily resting in every sovereignty to control and regulate the relative rights of individuals where those rights are of a public nature and pertain to its citizens in common. This being so, no constitutional provision is necessary to give it force. The power is not born of written constitutions but is usually limited by them. It therefore follows that the people, through their representatives are to determine the question as to the propriety and expediency of exercising this right—they are to say what property may be taken for public use, and to declare what shall be deemed public and private uses, limited only by the Constitution. \* \* \* But what branch of the government is to determine what enterprises are of a public and what of a private character? In the case of *Beekman* v. *S & S R R Co.,* 3 *Paige* (NY) 73, Chancellor Walworth says: 'If the public interest can be in any way promoted by the taking of private property, it must rest in the wisdom of the legislature to determine whether the benefit to the public will be of sufficient importance to render it expedient for them to exercise the right of eminent domain.' Upon this point, see the cases reported in *Commonwealth* v. *Breed,* 4 Pick (21 Mass), 460, 463; *Charles River Bridge* v. *Warren Bridge,* 7 Pick (24 Mass) 344, 453, 475, 476; *Hazen* v. *Essex Company,* 12 Cush (66 Mass) 475, 477; *Newcomb* v. *Smith,* 1 Chandler (1 Wisc) 71, 80."

To this we need only to add that passage from American Jurisprudence which has been quoted heretofore with a curious selectivity. The full quote reads as follows:

"What is a public use is not capable of absolute definition. A public use changes with changing conditions of society, new appliances in the sciences, and other changes brought about by an increase in population and by new modes of transportation and communication. The courts as a rule have attempted no judicial definition of a public as distinguished from a private purpose, but have left each case to be determined by its own peculiar circumstances. Generally, a public purpose has for its objective the promotion of the public health, safety, morals, general welfare, security, prosperity, and contentment of all the inhabitants or residents within the municipal corporation, the sovereign powers of which are used to promote such public purpose. The phrase 'municipal purpose' used in the broader sense is generally accepted as meaning public or governmental purpose as distinguished from private. The modern trend of decision is to expand and liberally construe the term 'public use' in considering State and municipal activities sought to be brought within its meaning. The test of public use is not based upon the function or capacity in which or by which the use is furnished. The right of the public to receive and enjoy the benefit of the use determines whether the use is public or private.

*"The determination of what constitutes a public purpose is primarily a legislative function, subject to review by the courts when abused, and the determination of the legislative body of that matter should not be reversed except in instances where such determination is palpable and manifestly arbitrary and incorrect."* (Emphasis added.) 37 Am Jur, Municipal Corporations, § 120, pp 734, 735.

The revenue bond act of 1933 (CL 1948 and CLS 1961, § 141.101 *et seq.* [Stat Ann 1958 Rev and Stat

Ann 1961 Cum Supp § 5.2731 *et seq.*]), whose stated purpose was to authorize public improvements, provided that the term "public corporation" shall be construed to mean any city and that the term "public improvements" includes yacht basins and harbors.[1]   Although the proposed marina will not be financed by the issuance of revenue bonds, the revenue bond act also provided "the powers in this act granted may be exercised notwithstanding that no bonds are issued hereunder."[2]   See *Seltzer* v. *Sterling Township*, 371 Mich 214.

The Michigan State waterways commission was created in 1948 by PA 1947, No 320 (CL 1948 and CLS 1961, § 281.501 *et seq.* [Stat Ann 1961 Rev § 3.534(1) *et seq.*]).   This act provides principally for (a) "the acquisition, construction and maintenance of harbors and channels" and (b) "the regulation and control of boating within the boundaries of this State."

Commission activities are financed by a transfer to the commission of revenues under PA 1911, No 70, as amended (CL 1948 and CLS 1961, § 207.51 *et seq.* [Stat Ann 1960 Rev and Stat Ann 1965 Cum Supp § 7.281 *et seq.*]) providing for collection of tonnage and watercraft license fees.   Additional financing is enabled under PA 1947, No 320, § 9 (CLS 1961, § 281.509 [Stat Ann 1961 Rev § 3.534(9)]), directing that one-half of one per cent of the gasoline tax shall be turned over to the commission "to improve boating facilities throughout the State."   No limitation on the kind and nature of boating facilities is indicated and the reference to boating facilities is made in general terms.

This Court should also take judicial notice of the fact that recreational boating has continued to be

[1] See CLS 1961, § 141.103 (Stat Ann 1958 Rev § 5.2733).—Reporter.
[2] See CLS 1961, § 141.104 (Stat Ann 1958 Rev § 5.2734).—Reporter.

one of the leading outdoor pastimes in Michigan. Our State leads all other states in registered watercraft, and the total State recreational fleet is estimated to be in excess of 500,000 craft.

In view of the magnitude of boat ownership, it should not surprise us that the legislature has decided to act as it has in connection with boating facilities. The legislature, whose wisdom we cannot question, has decided that the public interest would be served by the governmental construction of harbors or yacht basins or, if you will, marinas.

But whether this Court is willing to admit that determination of what constitutes a public question is a legislative function or not, the construction of a marina by the city of Detroit clearly meets the test of a public purpose which the courts have taken upon themselves to formulate.

In *Allydonn Realty Corp.* v. *Holyoke Housing Authority,* 304 Mass 288 (23 NE2d 665), quoted in part in Mr. Justice Kelly's current opinion, and previously relied upon by this Court in *In re Brewster Street Housing Site* (1939), 291 Mich 313, the Court concludes its discussion with these remarks:

"It is hardly necessary to say that the foregoing considerations are in no sense to be regarded as exclusive of others, and that great weight or little or no weight may be attached to some of them according to the presence or absence of others, or of still other conditions not hereinbefore enumerated." *Allydonn Realty, supra,* p 293.

Therefore, rather than attach any great weight to one or all of the separate tests set forth in *Allydonn, supra,* or comb the reports for other tests, suffice it to say that I see little to distinguish off-street garages built by the city of Detroit to house cars from marinas built to house boats,

Furthermore, this Court in *Gilbert* v. *Traverse City*, 267 Mich 257, 261, did not find it necessary to belabor the obvious. There the Court remarked that:

"The city of Traverse City proposes to construct a municipal harbor and park development, comprising a harbor and yacht basin, auditorium, casino, bath house, museum, storage yard for yachts and boats, and other park and recreational facilities. * * * The project in question seems to be authorized by article 8, § 22, conferring upon cities the power to construct and maintain parks and other works which involve the public health and safety."

Since this Court has indicated that construction of a "harbor and yacht basin, * * * storage yard for yachts and boats," or in other words, a marina, involves "the public health and safety," and since the legislature whose business it is, said that constructing and operating a marina is a public purpose, we agree with the trial court which decided that construction of a marina by the city of Detroit constitutes a public purpose.

But there are further objections that the question presented is not the right to construct a marina. The question is whether the city can restrict its use as planned. Here reference is apparently being made to the fact that although the marina will open on a first-come, first-served basis, thereafter vacancies will only occur upon the expiration and failure to renew any such lease. Thus a single boat owner could occupy the same slip for years to the exclusion of the general public.

This problem is apparently caused by the two sentences that appear in 37 Am Jur, Municipal Corporations, § 120, which read:

"The test of public use is not based upon the function or capacity in which or by which the use is fur-

nished. The right of the public to receive and enjoy the benefit of the use determines whether the use is public or private." (p 735)

That this is merely another facet of the public purpose test and not an all pervading consideration is evident in the field of public housing, where the same lease renewal provisions exist and where it is possible for a single family to occupy the same unit for many years.

The United States Supreme Court has said that it "is not essential that the entire community, nor even any considerable portion, should directly enjoy or participate in any improvement in order to constitute a public use." *Rindge Company* v. *County of Los Angeles*, 262 US 700, 707 (43 S Ct 689, 67 L ed 1186). The Illinois supreme court has clearly stated the logical principle: "If it can be seen that the purpose sought to be obtained is a public one and contains the elements of public benefit, the question of how much benefit is thereby derived by the public is one for the legislature and not the courts." *People, ex rel. McDavid*, v. *Barrett*, 370 Ill 478, 482 (19 NE2d 356, 121 ALR 1311, 1315).

In the case before us it has been pointed out that the only practical way a marina can successfully operate is to allow renewal of leases from year to year. Mr. Justice KELLY is in the curious position of postulating that although the city of Detroit can construct a marina, it cannot operate the marina so as to insure its success.

The conclusion is compelling. Neither the construction nor the operation of a marina by the city of Detroit will violate the constitutional prohibition against expenditures of money or other property for other than public purposes.

The trial court was also clearly correct in holding that because of new circumstances and changes in

public opinion and decisions in Michigan and other jurisdictions upholding the right of cities to construct and operate marinas, the Gray Case does not control the issues in this cause.

This leaves only defendant-appellant's contention that the lower court was in error in holding that approval of the electors must be secured before constructing the marina.

Section 5(e) of the home rule act, CL 1948, § 117.5 (Stat Ann 1949 Rev § 5.2084) provides in part:

"No city shall have power:  *  *  *
"(e) To  *  *  *  engage in any business enterprise requiring an investment of money in excess of 10 cents per capita  *  *  *  unless approved by 3/5 of the electors voting thereon at any general or special election."[3]

Accordingly, the charter of the city of Detroit provides in part in title 3, chap 1, § 12(h):

"Section 12.   The legislative powers and duties of the council shall be as follows: *  *  *  (h)  *  *  * provided, that it shall not have the power to  *  * * engage in any business enterprise requiring an investment of money in excess of 10 cents per capita unless first approved by three-fifths of the electors voting thereon at any general or special election."

The population of the city of Detroit was 1,670,-144 in 1960, with a resultant limitation of expenditures for a business enterprise of $167,014.40, well below the projected $1,365,000 to be expended for the proposed marina.

Of course, if the operation of a marina does not constitute a business enterprise, then the above sec-

---

[3] This section, subsequent to initiation of this suit, was amended by PA 1965, No 65 (Stat Ann 1965 Cum Supp § 5.2084), which requires only majority approval by the electors rather than a 3/5 concurrence of electors.

tions of the city charter are inapplicable and approval of the city electors would not be necessary.

The key word in defining a business enterprise is profit. "Business Enterprise: Investment of capital, labor or management in an undertaking for profit; one of the recognized attributes is centralized management and control. *Helvering* v. *Jewel Mining Co.* (CA 8), 126 F2d 1011, 1015." Black's Law Dictionary (4th ed, 249).

Although our Court has not hesitated to characterize the activity of a city as proprietary for purposes of tort liability (see *Barron* v. *City of Detroit,* 94 Mich 601 (19 LRA 452, 34 Am St Rep 366), *Borski* v. *City of Wakefield,* 239 Mich 656, *Lyshak* v. *City of Detroit,* 351 Mich 230, *Marks* v. *City of Battle Creek,* 358 Mich 114), the case law is not as clear as to what constitutes a "business enterprise" within the meaning of section 5(e) of the home-rule act (CLS 1961, § 117.5(e) [Stat Ann 1963 Cum Supp § 5.2084(e)]). However, in *Cleveland* v. *City of Detroit,* 324 Mich 527 (11 ALR2d 171), the Court ruled that an underground parking project beneath the surface of Washington Boulevard was not a business enterprise requiring voter approval under either the home-rule act or the charter of the city of Detroit.

One consideration that is apparent from the *Cleveland Case, supra,* is that even though a fee is charged for use of the facilities, this does not necessarily transform the undertaking into a business enterprise.

If a parking facility for motor vehicles is not a business enterprise, then the operation of a marina, a parking facility for boats, involving as it does public health, recreation, and welfare, is not a business enterprise. It seems the city of Detroit is discharging its obligation to provide adequate, safe

recreational facilities for its population.  Viewed in this light, there is little to distinguish a marina from a city-owned swimming pool, canoe rental, ice skating rink, or any other recreational facility.

The Court's remarks concerning another marina project, in *Gilbert* v. *Traverse City,* supra, at p 261, are informative:

"The project in question seems to be authorized by article 8, § 22, conferring upon cities the power to construct and maintain parks and other works which involve public health and safety."

If such projects concerning public health and safety are to be characterized as "business enterprises" requiring voter approval, the discharge of one of government's primary functions will be needlessly complicated.

We hold the operation of marina is not a "business enterprise" within the meaning of section 5(e) of the home rule act or title 3, chap 1, § 12(h) of the charter of the city of Detroit; therefore, the approval of the electors is not needed.

The trial court's judgment holding that approval of the electors must be secured before constructing the marina is reversed.  The trial court's finding that the Gray Case is not *res judicata* and determinative of the issues in this case, and that construction and operation of the proposed marina constitutes a public purpose, is affirmed.

BLACK and SMITH, JJ., concurred with T. M. KAVANAGH, C. J.

O'HARA, J. *(for dismissal of bill).*  I echo the grave concern expressed by the Association of Municipal Attorneys in its *amicus curiae* brief over the "harsh consequences which can result from a

decision adverse to the city of Detroit." Such decision, I fear, would be the solemn requiem for the whole Statewide small craft harbor development program.

Appellant municipality, the city of Detroit, correctly states the issues presented by this appeal as follows:

"Is the case of Edward Gray, Inc., *v.* City of Detroit *res judicata* and determinative of the issues in this cause? * * *

"Does the construction, operation and maintenance of the proposed city marina on George Engel Memorial Park constitute a public purpose? * * *

"Is the city of Detroit required, under title 3, chapter 1, § 12(h) of its charter and also under section 5(e) of the home rule act (CL 1948, § 117.5[e] [Stat Ann 1963 Cum Supp § 5.2084(e)]), to secure approval of three-fifths of the electors before constructing the proposed marina?"

Our Court seems in complete accord that the Gray Case[1] either does not or should not control. Further discussion of this point is not indicated.

The second question is stated by Justice KELLY as follows:

"The question presented is not the right to construct the marina. *The question is whether the city can restrict its use as planned.*" (Emphasis supplied.)

As I understand Justice KELLY he holds that the expenditure of tax funds on construction of the marina is for a public purpose, but the proposed rental and renewal procedure vitiates that purpose.

I address myself then to the "restricted use" test of Mr. Justice KELLY. In the first instance, it must be understood that there is an infinity of difference

---

[1] Edward Gray, Inc. *v.* City of Detroit (Circuit Court for the county of Wayne, in chancery, #175,077).

between watercraft commissioned for a season's sailing and requiring a permanent mooring facility, and a trailered boat which can be put in or taken out of the water for and after each use, at a launching ramp, or indeed pulled up on the beach out of harm's way by hand.

Once commissioned a seasonal-use watercraft by its inherent nature must have a permanent and assigned mooring place. Safety of the craft demands it, whether sail or power. In most instances, sailcraft ride free and swing with the mooring buoys. Their fixed keels require relatively deep draft. Power boats need "finger slips," referred to herein as mooring "wells." They require less depth. But in either case the harried boat owner cannot come down daily to a publicly constructed and operated marina and ask for a slip or a buoy. Expatiating on the point is useless. A boat owner knows this. His nonboating fellow citizen must either take it on faith or have the experience the boater has often painfully and expensively learned. In irreducible simplicity, one cannot pick up a nontrailered, season-commissioned watercraft at the end of a day's use and throw it over one's shoulder like a golf bag, stick it in a case like a shotgun, or stow it away in a tackle box like a jointed fish pole. Owning a boat of the kind here involved, up to 26 feet overall, is almost as demanding as owning an elephant. The *sine qua non* is a safe and adequate place to keep it. Thus I postulate that seasonal rental of a mooring facility for sail or power is inherently necessary to the operation of a marina, public or private.

The second point raised by Justice KELLY is the renewal feature of the seasonal renting. I believe this is equally fallacious. I don't quite see how equality of treatment is served by putting public mooring places up for grabs each year. First it is

self-defeating. The nontrailered boat of the type above described is "lifted" at the season's end. It is then stored either under a tarpaulin or in a building, but in either case at the marina. The lift moves the craft only to its cradle and to the adjoining storage space inside or out. If the unfortunate owner draws a blank for the forthcoming year, he has no choice but to leave the craft where it is and pay storage. The new lucky owner now has a slip, or a buoy, but at the next season's end his position is equally untenable. Absent a place to store it at the marina when fall crispens the air, he can't leave it to the untender mercy of a Michigan winter, with the crunch of ice against the hull. He would have to move it by special motor carrier to some place where storage could be found.

For these very inherent requirements the operation of a public marina must in substance conform to the practice in its privately operated counterpart. The "restrictive use" test is impractical and unworkable. There is no way to operate a marina successfully and rent mooring space therein on a day-to-day basis.

Passing now to the public purpose question. In Michigan, constructing and operating a marina is a "public purpose" because the legislature, whose business it is, said so.

The revenue bond act of 1933[2] is an act, the stated purpose which was to "authorize public corporations to construct  *  *  *  public improvements." It provides that the term "public corporation" shall be construed to mean any city. The term "public improvements" specifically includes yacht basins and harbors. Detroit is a city, hence a public corporation. It would seem this public corporation is doing precisely what the statute authorized it to do.

---

[2] CL 1948 and CLS 1961, § 141.101 *et seq.* (Stat Ann 1958 Rev and Stat Ann 1961 Cum Supp § 5.2731 *et seq.*).

What of appellees' point that the marina's construction is not being financed by the issuance of revenue bonds? The answer again was legislatively supplied:

"The powers in this act granted may be exercised notwithstanding that no bonds are issued hereunder."[3]

Since the city then may do what it proposes to do with its own funds, may it do so in conjunction with the 1947 State waterways commission act and its matching funds? The statute[4] answers:

"The several counties, townships, cities and villages of this State, within the jurisdiction of which are situated inland waterways connected with or connecting the waters of the Great Lakes, or within which channels to nearby inland lakes and streams may be constructed or opened for navigation and shelter of light draft vessels, *are hereby authorized by majority vote of their respective legislative bodies,* to enter into contracts and agreements with the commission in the accomplishment of the purposes herein set forth." (Emphasis supplied.)

What then is the use of these chancery proceedings? Can equity's historic injunctive power be effectively stultified by statute? Certainly not under our State Constitution. However, how that power relates to the issue herein has been clouded, if not completely obscured.

The able retired trial judge who unselfishly returned to perform judicial duties at our behest was in error when he concluded his decision as follows:

"The attempt in sections of the revenue bond act to bypass and thus in effect to amend, delete and nullify the city charter and home-rule provisions

---

[3] CLS 1961, § 141.104 (Stat Ann 1958 Rev § 5.2734).—REPORTER.
[4] PA 1947, No 320, § 5 (CL 1948, § 281.505 [Stat Ann 1961 Rev § 3.534(5)]).

requiring approval by a three-fifths vote of city electors *does not commend itself to the Court.".* (Emphasis supplied.)

I might add sympathetically that some things the legislature does, and in some cases does not do, don't commend themselves to me. This is not the point. The point is that under settled law:[5]

"The question of whether the proposed use is a public use is a judicial one."

The trial judge had already found:

"That in spite of the very excellent cross-examination of defendant witnesses, that the plaintiffs have *failed to prove that the proposed project is not for a public purpose."* (Emphasis supplied.)

When the court so found and held, it was no longer at liberty to apply the provisions of the home-rule act and its adopted counterpart provision in the city charter, inhibiting cities from engaging in "any business enterprise requiring an investment of money in excess of 10 cents per capita  *  *  * unless approved by three-fifths (3/5) of the electors voting thereon in any general or special election." The term "business enterprise" as used in the charter (Detroit charter, title 3, chap 1, § 12) and the home rule act (CLS 1961, § 117.5, subd [e] [Stat Ann 1963 Cum Supp § 5.2084, subd (e)]), and the term "public improvement" as used in the revenue bond act, are mutually exclusive.

This holding raises the inquiry how and under what circumstances can a protesting business interest or taxpayer obtain relief against a municipality which undertakes a statutorily designated "public improvement" which competes with and may adversely affect a similar private enterprise. The

---

[5] *Cleveland* v. *City of Detroit,* 322 Mich 172, at p 179.

answer is, that by judicial action he cannot, so long as the municipal activity is specifically designated by statute as a "public improvement" and the proof establishes that what is being undertaken conforms in fact with the legislative designation. However much judicial sympathy we might want to extend to an adversely affected citizen-taxpayer, he must find his relief in the legislature and not in the courts. We cannot rewrite the plain terms of the two statutes here involved. Particularly, we cannot say that when the legislature expressly designated the construction and operation of a yacht basin or harbor (which terms are synonymous with marina), a public improvement upon which public funds may be expended, that a charter or statutory restriction applying only to a "business enterprise" can prevent such expenditure.

I must add that I do not quite understand how Justice KELLY concludes that he is "reversing" Judge Elliott. Judge Elliott enjoined the city from expending any funds on the construction and operation of the marina. So did Justice KELLY. It seems to me he affirmed Judge Elliott, but for a reason other than he relied upon.

In any event, I would vacate the judgment entered by the trial court and direct the entry of a judgment dismissing the complaint and awarding no costs.

DETHMERS, J., concurred with O'HARA, J.


ADAMS, J. (*dissenting*). I agree that the determination of what constitutes a public purpose is primarily a legislative function and that there has been no abuse by the legislature of that function in its determination that the construction and operation of marinas is within the broad concept of public purpose.

The construction, operation and maintenance of the proposed city marina, in my opinion, is a "business enterprise" as those words are used in section 5(e) of the home-rule act (CLS 1961, § 117.5(e) [Stat Ann 1963 Cum Supp § 5.2084(e)]) and the charter of the city of Detroit, title 3, chap 1, § 12(h).

Neither the home-rule act nor the charter defines "business enterprise." Michigan cases have been concerned primarily with the distinction between governmental and proprietary functions of cities. "Business enterprise" (while having a definite meaning of its own) can most nearly be equated to the proprietary function of a city.

*Barron* v. *City of Detroit,* 94 Mich 601 (19 LRA 452, 34 Am St Rep 366), declared that a market building constructed by a city was a proprietary function because there was "no imperative duty" cast on the city to construct such a building. *Andrews* v. *City of South Haven,* 187 Mich 294, 299 (LRA1916A 908, Ann Cas 1918B 100), held that an electric light plant was a "business concern or enterprise." In *Borski* v. *City of Wakefield,* 239 Mich 656, a bus line was declared to be a purely business enterprise. In *Lyshak* v. *City of Detroit,* 351 Mich 230, a golf course, and in *Marks* v. *City of Battle Creek,* 358 Mich 114, an airport, were declared to be proprietary functions.

*Cleveland* v. *City of Detroit,* 322 Mich 172, involved the power of the city of Detroit to condemn property for a bus terminal and *Cleveland* v. *City of Detroit,* 324 Mich 527 (11 ALR2d 171), involved a project for underground parking. Both cases held the projects were not business enterprises, but there was no discussion of what is or is not a business enterprise in either case. They are not necessarily controlling here.

*Mayor and City Council of Baltimore* v. *Baltimore Steam Packet Company,* 164 Md 284, 292 (164 A 878, 881), analyzed the difference between the use of streets and water front developments as follows:

"The ordinary piers belonging to the city are in a material respect unlike the streets and other property to be maintained for the general public use. Held in what has been distinguished as the private ownership of the city, they are available to be given over into exclusive private use, for the purpose of raising revenue. 'But the right to construct wharves is not held by the municipal corporation in its public or governmental capacity; the erection and maintenance of such structures are merely a business enterprise in regard to which the municipality acts in its private capacity.' Farnham, Waters, § 123A; *Dyer* v. *Baltimore* (DC Md), 140 F 880. And city piers are commonly leased to private occupants for that purpose. *In re Mayor etc. of City of New York,* 135 NY 253 (31 NE 1043); *Morgan City* v. *Dalton,* 112 La 9 (36 So 208); *Baltimore & Philadelphia Steamboat Co.* v. *Starr M. P. Church,* 149 Md 163 (130 A 46); *Baltimore City* v. *Steamboat Co.,* 104 Md 485, 488 (65 A 353). The grant of such property is not a grant of a privilege of exercising a calling by the grantee on property maintained for general public use, usually termed a license or franchise. 1 Dillon, Municipal Corporations (5th ed), § 363. It is ordinarily a bilateral dealing such as private owners might engage in. And it seems at the outset that, engaged in the same utilization of the public property as private parties commonly engage in with private property, the parties to this grant probably intended to deal in the habitual, conventional manner, with the grantee bound to the whole of the specified term."

In 18 McQuillin, Municipal Corporations (3d ed), at p 393, the following comment is made:

"It is generally held that a municipality functions in a private or proprietary capacity in operating and maintaining a pier or wharf."

However, it is not possible to determine what is a business enterprise simply on the basis of the particular activity. For example, if a city should decide to provide a golf course for the public, there being none in the community, this would be a proprietary function, not a business enterprise even though a fee was charged. But if the city was amply provided with privately operated golf courses open to the public, and yet elected to operate a golf course of its own, the activity would be a business enterprise.

As applied to a city, the key word in defining a business enterprise is not necessarily profit. In the case of *Union City Housing Authority* v. *Commonwealth Trust Co.* (1957), 25 NJ 330 (136 A2d 401), the New Jersey court considered how to distinguish between governmental and proprietary activities and noted that profit is too narrow a test. It indicated other tests to be applied are whether the service is a traditionally governmental one, whether it is a mandatory duty imposed by the legislature, and whether the activity is permissive. The court concluded:

"The significant and controlling feature was that Delaware township 'conducted a business in essentially the same manner as a private utility.' "

Business enterprises of cities do not involve an imperative duty, or a duty imposed by the legislature. They may be for profit. They may impinge upon and compete with private enterprise. They are conducted much like private business. Only by considering every aspect of an activity can a determination be made and effect given to the legislative and charter language which was intended to restrain

a city from engaging in a substantial operation on the periphery of its corporate powers, *i.e.,* a business enterprise, without approval by the people.

The summary of operating statements for the city of Detroit's existing Memorial Park marina shows total revenues for 1964 of $37,135, and excess revenues over direct expense of $33,267.89; for 1963 of $36,812.50 and excess revenues of $21,089.64 over direct expense. Statements for 1959, 1960, 1961 and 1962 also reflect substantial revenues in excess of direct expense.

Plaintiff Kean Estates Corporation, at the time of trial, had 23 vacant boat wells and had had vacancies over a five-year period. Plaintiff Gregory Marina, Inc., had 20 vacancies and had had vacancies in each of the past five years. Detroit Boat Basin, Inc., had 14 vacancies and had had vacancies in each of the past five years. No marina in the area other than the city's existing marina had a waiting list. Plaintiff Kean Estates found 12 of its former customers on the list of tenants at the city's existing marina, and 16 of its customers on the city's waiting list. Gregory Marina, Inc., found 8 of its former customers were tenants of the city and 11 of its customers on the city's waiting list. Detroit Boat Basin, Inc., an affiliate of Gregory Marina, Inc., found 5 of its former customers were customers of the city and 6 of its customers on the city's waiting list.

I agree with the trial judge who wrote:

"It is a commonplace in the law that an activity may be sufficiently a public function or a governmental function that a city may constitutionally engage therein, and yet * * * be performing a proprietary function. * * * The plans for operating the proposed marina, as testified to in this case, are most similar to the operation of a private marina,

and the proposed marina will admittedly, if constructed, be in direct competition with private marinas. * * *

"Defendant city's counsel in his opening statement, * * * recognized the business aspect of the proposed project. * * * We think it is equally clear that the proposed operation would be a 'business enterprise' within the meaning of the home rule act and the charter requiring a three-fifths vote."

For the reasons above stated, I would affirm the judgment of the trial court.